## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

MARK MILITELLO, individually and
on behalf of all others similarly situated,

      Plaintiff,

  v.

FORD MOTOR COMPANY,

         Defendant.

Case No. _____

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................... 1

II.    JURISDICTION AND VENUE ......................................................... 9

III.   PARTIES .......................................................................... 10

    A.   Plaintiff .................................................................. 10

    B.   Defendant ................................................................. 11

IV.   FACTUAL ALLEGATIONS ........................................................... 12

    A.   Chain-Driven Water Pumps ................................................... 12

    B.   The Water Pump Defect ....................................................... 16

    C.   Defendant Touted Reliability, Quality, and Safety in Its Marketing and Advertising ........................................................... 29

    D.   Defendant's Knowledge of the Defect and Associated Safety Risk ...... 33

         1.   Defendant Knew that a Defect in the Class Vehicles' Water Pump Had the Potential to Cause Catastrophic Engine Failure Given the Water Pump's Design and Location ........................... 35

         2.   Defendant Knew About the Water Pump Defect Based on the Volume of Complaints filed with NHTSA ........................... 38

         3.   Defendant Knew About the Water Pump Defect Based on the Severity of the Safety Risk Caused by the Water Pump Defect .. 49

         4.   Defendant Knew About the Water Pump Defect Through, and as Reflected by, Online Complaints ..................................... 64

         5.   Defendant's Knowledge of the Water Pump Defect Is Demonstrated by the Development History of the Internal Water Pump ...................................................................... 71

         6.   Ford's Knowledge of the Water Pump Defect is also Reflected in Ford's Visual Inspection Charts ................................. 73

V.    TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL ....... 80

VI.   CLASS ACTION ALLEGATIONS .............................................. 81

VII.  CLAIMS FOR RELIEF ....................................................... 85

VIII. PRAYER FOR RELIEF ....................................................... 103

IX.   DEMAND FOR JURY TRIAL .................................................. 104

The allegations herein are based on personal knowledge as to Plaintiff's own conduct, and are made on information and belief as to all other matters based on an investigation by counsel:[1]

## I. INTRODUCTION

1. In modern vehicles, including the Class Vehicles (defined below), the useful life of the engine is well over 150,000 miles. Ford Motor Company ("Ford" or "Defendant") represents that the internal water pumps installed within the engines of the Class Vehicles should last for the useful life of the engines without the need for any service, maintenance, or repair. Indeed, Ford omits the water pump from the service and maintenance schedules, which identify any vehicle components that need to be maintained, repaired, or replaced within the first 150,000 miles of operation. Not only does Ford represent that the water pump will not need to be serviced or maintained, but the internal location of the water pump in the engine conceals it from view and inspection when other routine service is being performed on the Class Vehicles (defined below).

2. Despite knowing for more than a decade that its vehicles incorporating the Ford Cyclone Engine, branded as the Duratec engine (the "Cyclone Engine"),

---

[1] Counsel's investigation includes an analysis of publicly available information, including consumer complaints to the National Highway Traffic Safety Administration ("NHTSA") and additional analysis. Plaintiff believes that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

contain a defect in design (the "Water Pump Defect" or "Defect") that can cause the internal chain-driven water pump ("Internal Water Pump") to prematurely fail well before the end of the useful life of the engine, leading to a costly replacement or catastrophic engine failure due to the water pump's placement inside the engine block. Ford failed to disclose the Water Pump Defect to consumers or fix the Defect and instead, concealed it.

3.     Beginning in 2007 and through at least 2020, Ford has incorporated the Cyclone Engine, containing an Internal Water Pump with the Defect into thousands of vehicles (the "Class Vehicles"). Unbeknownst to purchasers of the Class Vehicles at the time of purchase, the Class Vehicles contain the Water Pump Defect.

4.     Plaintiff Mark Militello ("Plaintiff") brings this class action against Ford, individually and on behalf of all persons in New York who purchased a Class Vehicle from an authorized Ford dealer, asserting claims on behalf of the New York Class (defined below, and also referred to as the "Class") for violation of the New York consumer protection statutes, N.Y. Gen. Bus. Law §§ 349-350 *et seq.*, breach of implied warranty, and common law fraud.

5.     The Cyclone Engine Internal Water Pump is a chain-driven water pump, which means the timing chain is connected to the water pump and provides the power the water pump needs to circulate coolant through the engine when the engine is running.

6.     The chain-driven Internal Water Pump in the Class Vehicles is located internal to the Cyclone Engine, behind numerous engine components, including the timing chain cover. Because of this, it is hidden from view, even during other routine maintenance or service, within the engine compartment, and is extremely time-consuming and expensive to repair or replace—over $1,500.

7.     Moreover, due to its placement, the Internal Water Pump cannot be inspected in a routine, cost-effective manner. In order to access the Internal Water Pump, a mechanic must remove the passenger front wheel fender liner, coolant reservoir, air filter box, throttle body, intake manifold, ignition coils, valve covers, engine mount and bracket, AC compressor belt, AC drive tensioner, power steering pump, crank shaft pulley, and timing cover. The Internal Water Pump is located behind the timing cover. Consequently, disassembling the engine and components to gain access to the Internal Water Pump—and then later reassembling the vehicle and components—requires approximately eight (8) hours of labor and the replacement of several gaskets and seals. As such, conducting even just a basic, visual inspection can cost nearly $1,000.

8.     Additionally, the location of the water pump in the Cyclone Engine is in line with the crankshaft and over the main body of the engine. As a result of this location and the Water Pump Defect, coolant is able to leak from the water pump into the oil pan, allowing it to mix with the engine's oil. This mixture of engine oil

and coolant circulates throughout the engine, often leading to destruction of the engine, as numerous Class Vehicle purchasers have reportedly experienced.

9.     Plaintiff and members of the New York Class relied on Ford's representation and had a reasonable expectation that the Internal Water Pump in the Class Vehicles did not require costly maintenance, service, repair, or replacement before the vehicles were driven at least 150,000 miles.

10.    Ford did not disclose the Defect or that Class Vehicles may suffer a sudden Internal Water Pump failure that poses significant safety risks when the Class Vehicles suddenly become inoperable due to catastrophic engine failure, nor are they warned that due to the relatively inaccessible location of the Internal Water Pump in the engine, the cost to repair or replace the defective Internal Water Pump is significant, even in situations where the entire engine is not destroyed.

11.    Upon information and belief, Ford worked in conjunction with Mazda Motor of America, Inc. d/b/a Mazda North American Operations ("Mazda") with respect to the design, engineering, development, and/or testing of the Cyclone Engine. In fact, Mazda also incorporated the Cyclone Engine into some of its own vehicles, under the brand name MZI.

12.    Based on pre-production testing, design failure mode analysis, manufacturing principles, warranty claims and consumer complaints to Ford, its dealers, NHTSA, and/or Mazda, *inter alia*, Defendant was aware of the Water Pump

Defect in the Class Vehicles, but concealed the Defect from Plaintiff and members of the New York Class. Indeed, despite being aware of the Defect and numerous complaints, Ford knowingly, actively, and affirmatively omitted and/or concealed the existence of the Water Pump Defect to increase profits by selling additional Class Vehicles at inflated prices and by unlawfully transferring the cost of repair or replacement of the Internal Water Pump and damaged engine parts to Plaintiff and members of the New York Class. Ford created its unconscionable warranties, including the durational limits, to transfer this cost of repair or replacement to Plaintiff and members of the New York Class, with the knowledge that the majority of Internal Water Pump failures would occur outside of the durational limits of the warranties.

13.    Knowledge and information regarding the Water Pump Defect and the associated safety risk was in the exclusive and superior possession of Defendant, its partner Mazda, and their authorized dealers, and was not provided to Plaintiff and members of the New York Class, who could not reasonably discover the Defect through due diligence. To be sure, despite Defendant's knowledge, Ford continued selling defective vehicles, has failed to disclose the existence of the Water Pump Defect to Plaintiff and members of the Class or its associated safety risk, has not issued a recall, and has not remedied the Defect and/or compensated Class Vehicle purchasers for this material Defect.

14.    No reasonable consumer expects to purchase a Class Vehicle that contains a concealed Water Pump Defect which creates the safety hazards and significant monetary losses detailed herein. The Water Pump Defect is material to Plaintiff and members of the New York Class because when they purchased their Class Vehicles, they reasonably expected that the Class Vehicles would be free from known, undisclosed defects. Plaintiff and New York Class members also reasonably expected the Class Vehicles were free from the Water Pump Defect given the fact that Ford did not disclose the Defect or the significant costs consumers must incur to inspect, service, or maintain the Internal Water Pumps within the normal expected useful life of the Class Vehicles to avoid water pump failure or catastrophic engine failure. Had Defendant disclosed the Water Pump Defect, Plaintiff and members of the New York Class would not have purchased the Class Vehicles, or would have paid less for their Class Vehicles.

15.    Indeed, the Water Pump Defect presents a significant safety risk for Plaintiff and members of the New York Class because the water pump may suddenly and unexpectedly fails, potentially causing catastrophic engine failure. When this happens, the Class Vehicles lose engine power, including the ability to accelerate, maintain speed, readily control steering, and/or fully engage the brakes. Thus, drivers and occupants of the Class Vehicles are at risk for serious accidents as a

result of Defendant's failure to disclose the existence of the Water Pump Defect and its corresponding safety risk.

16.    This hazardous Defect has resulted in numerous complaints to NHTSA. For example, many Ford customers have reported sudden engine failure while driving as a result of the Water Pump Defect, leading to dangerous on-road situations.

17.    Defendant provides warranty coverage for Class Vehicles under one or more unconscionable warranties. For illustrative purposes, Defendant currently offers New Vehicle Limited Warranty coverage for Class Vehicles sold under the Ford brand—and did the same for Class Vehicles sold under the Mercury brand until the brand was discontinued—for 3 years or 36,000 miles and offers extended warranty coverage for Powertrain components for 5 years or 60,000 miles.[2]

18.    Defendant breached its implied warranties, through which it promised to, *inter alia*, provide Class Vehicles fit for the ordinary purpose for which they were sold. Because the Water Pump Defect was present at the time of sale of the Class Vehicles and was concealed from Plaintiff and members of the New York Class,

---

[2] *See, e.g.*, Exhibit A (Ford Cars and Trucks 2018 Model Year Warranty Guide); Exhibit B (Mercury 2009 Model Year Warranty Guide). For the Class Vehicles sold under the Lincoln brand name, Defendant has provided New Vehicle Limited Warranty coverage for the Class Vehicles for 4 years or 50,000 miles and extended warranty coverage for Powertrain components for 6 years or 70,000 miles. *See* Exhibit C (Lincoln 2012 Model Year Warranty Guide).

Ford failed to meet this obligation. Class Vehicles containing the Defect are not fit for their intended purpose: to provide safe and reliable transportation.

19.    Furthermore, given the latent nature of the Water Pump Defect, Defendant knew that the majority of Internal Water Pump failures likely would occur outside of the warranty periods, and has intentionally and wrongfully transferred the significant costs of repair or replacement to Plaintiff and members of the Class through its unconscionable durational warranty limits and fraudulent concealment of the Defect. These costs are significant and range in the thousands of dollars. No reasonable consumer expects to incur such costs during the useful life of the engine, especially given Defendant's representations in the maintenance schedules provided to Class Vehicle purchasers, which do not include the Internal Water Pumps. In light of the substantive and procedural unconscionability of Ford's warranties, Defendant's attempt to enforce warranty terms and/or durational limitations against Plaintiff and the New York Class is unconscionable.

20.    As a result of the Water Pump Defect and the placement of the water pump internal to the Cyclone Engine, repair or replacement of the water pump can lead to Plaintiff and Class members being forced to pay over $1,500 for replacement of the water pump alone, or as much as $9,000 to replace a destroyed engine.

21.    Plaintiff and members of the New York Class did not receive the benefit of their bargain as a result of Ford's misconduct and overpaid for Class Vehicles

with the undisclosed Defect. As a direct result of Defendant's unlawful conduct, Plaintiff and members of the Class have been harmed and are entitled to, *inter alia*, actual damages, including: damages for diagnosis, repair and/or replacement of the water pump, damaged engine parts or the entire engine; damages for the diminished value of their vehicles; overpayment damages; cost of repair damages; diminished value damages; compensatory, statutory, and punitive damages; attorneys' fees; costs; and/or restitution.

## II.   JURISDICTION AND VENUE

22.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are more than 100 members of the Class, members of the Class (as defined below) are citizens of a state different from Defendant, and greater than two-thirds of the members of the Class reside in a state other than the state in which Defendant is a citizen. This Court also has jurisdiction over supplemental state law claims pursuant to 28 U.S.C. § 1367.

23.   Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b), and (c) because: Defendant maintains operational facilities in New York and in this District; a substantial part of the events or omissions giving rise to Plaintiff's and the New York Class' claims occurred in New York and in this District; Defendant has caused harm to Plaintiff and the New York Class members transacting and residing

in New York and in this District; and Defendant conducts a substantial amount of business in New York and in this District.[3] Furthermore, Defendant has marketed, advertised, and sold the Class Vehicles in New York and in this District. Accordingly, Defendant has sufficient contacts with New York and this District to subject Defendant to personal jurisdiction in the District, and venue is proper.

## III.   PARTIES

### A.   Plaintiff

24.   Plaintiff Mark Militello is a citizen of the State of New York and resides in Victor, New York. In March 2019, Plaintiff Militello bought a 2016 Ford Explorer from Genesee Valley Ford, an authorized Ford dealer, in Avon, New York for personal, family, or household purposes. In or around September 2019, Plaintiff Militello experienced a water pump failure due to the Defect. Plaintiff Militello took his Class Vehicle to a mechanic for inspection, who diagnosed the cause of coolant leak as a water pump failure. The water pump failure occurred at approximately 61,300 miles. As a result of the Water Pump Defect, Plaintiff Militello was forced

---

[3] For example, Ford maintains a stamping plant in Buffalo, New York, that employs approximately 1,100 people. *See Worldwide Locations: United States – Buffalo Stamping Plant*, FORD, https://corporate.ford.com/operations/locations/global-plants/buffalo-stamping-plant.html (last visited Oct. 5, 2022) (stating that Ford has an eighty-eight-acre plant, opened in 1950, that "[s]tamps outer and inner commodities").

to pay approximately $2,000 for a water pump replacement and had to use a credit card to cover the cost.

25.    Plaintiff Militello was not informed by Ford of the Defect or the associated safety risk at the time he purchased his Class Vehicle from the Ford authorized dealer.

26.    The Water Pump Defect is material to Plaintiff Militello. Had Plaintiff Militello known that his Class Vehicle contained the Water Pump Defect, he would not have purchased it, or would have paid less for it.

**B.    Defendant**

27.    Defendant Ford Motor Company is a Delaware corporation, with its corporate headquarters located in Dearborn, Michigan.

28.    Ford designs, engineers, manufactures, markets, and/or sells vehicles throughout the United States, including New York, through its network of authorized dealers. Ford engages in interstate commerce by selling vehicles through its authorized dealers located in every state of the United States, including within this District.

29.    At all times relevant to this action, Defendant and/or its agents manufactured, distributed, sold and warranted the Class Vehicles, containing the Defect described herein, throughout the United States and in New York and in this District. Defendant developed and disseminated the owner's manuals and warranty

11

booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles.

## IV.   FACTUAL ALLEGATIONS

### A.   Chain-Driven Water Pumps

30.   Chain-driven water pumps are relatively new to the automobile industry. Historically, water pumps were located external to the engine block and driven by an accessory belt drive system. When such external water pumps fail, notice is provided to the driver of the vehicle in the form of coolant leaking onto the ground, steam coming from the engine, and/or dashboard warning lights indicating that the vehicle is overheating. More recently, automakers have attempted to remove items from the accessory drive belt in order to improve engine efficiency and to reduce the overall volume of the engine as to fit into smaller engine compartments.

31.   A chain-driven water pump is located within the engine block behind the timing chain cover and relies on the timing chain to deliver its power, as shown in the image below (the water pump is labeled "13"):



32.     An engine's timing chain is driven by the crankshaft and turns the camshaft, keeping it in sync with the crankshaft. The timing chain is constantly lubricated by oil, to ensure that it operates smoothly and without friction. On certain vehicles, including the Class Vehicles, the timing chain is connected to the water pump and provides the power the water pump needs to circulate coolant through the engine when the engine is running.

33.     A water pump can circulate up to 7,500 gallons of coolant per hour, which is required to prevent the engine from overheating. A typical water pump is made up of numerous components, including, *inter alia*, a shaft, bearing assembly,

13

mechanical seal with elastomer bellows, gasket, housing that encases the water pump, and a weep hole designed to let a small amount of leaked coolant escape rather than being forced into the water pump bearing assembly.

34.   Beginning in 2007 with the Cyclone Engine, Ford began using an internal chain-driven water pump, which it incorporated into the Class Vehicles. The Cyclone Engine, shown below, uses a double overhead camshaft ("DOHC") configuration with two camshafts connected to the crankshaft by a timing chain to ensure that the engine operating cycle is timed correctly. The chain-driven water pump is circled in the photo below:



35.     The engine cooling system in the Cyclone Engine, including the water pump, is intended to be a closed system, so that the coolant does not leak into/on engine parts or mix with the engine's oil and circulate throughout the engine.

36.     However, when the water pump fails in the Class Vehicles, coolant is able to escape from the closed system and leak into/on other engine parts, including, *inter alia*, the timing chain, crankcase, and/or oil pan, where it mixes with the engine's oil, as illustrated below.



Photo of an oil pan removed from a Ford Cyclone engine with a failed water pump The chocolate milk appearance of a coolant/oil mixture is clearly observed in the residual fluid that remained in the oil pan.

37.     If coolant mixes with engine oil, that mixture is then carried throughout the other parts of the engine, where it causes increased friction between contacting metal parts and leads to sudden, catastrophic engine failure.

**B.     The Water Pump Defect**

38.     Defendant is a manufacturer of vehicles sold under the Ford, Lincoln, and Mercury brand names throughout the United States, including New York. Defendant designed, manufactured, imported, distributed, marketed, and/or sold the Class Vehicles in the United States, including New York. Defendant also provides service and maintenance for the Class Vehicles through its extensive network of authorized dealers and service providers nationwide and in New York.

39.     Each of the Class Vehicles is equipped with the Cyclone Engine, which was introduced by Ford in 2007, and incorporated into thousands of Class Vehicles. Ford can identify the Class Vehicles by their Vehicle Identification Numbers ("VINs").

40.     As a result of the Water Pump Defect, all Class Vehicles with Ford Cyclone Engines have the propensity for the water pump to fail prior to the expected lifetime of an internal water pump, which is 150,000 miles, leading to catastrophic engine failure and/or costly repairs.

41.     Plaintiff and members of the Class purchased and/or own Class Vehicles that contain the Water Pump Defect, which can cause failure of the water

16

pump prematurely and without warning. The Water Pump Defect can also lead to catastrophic engine failure, causing a sudden loss of normal operation of the vehicle and requiring thousands of dollars for repair or replacement of the entire engine.

42.     The Cyclone Engine, and the Class Vehicles which are equipped with the engine, contain the Water Pump Defect, which is the result of a defect in design. By designing the Class Vehicles with the Water Pump Defect, Ford rendered the Class Vehicles defective, unsafe, and unfit for their intended use and purpose.

43.     Unlike a typical *external*, belt-driven water pump, the Cyclone Engine has an *internal* water pump connected to the crankshaft by the timing chain and positioned directly above the crankshaft and oil pan. This center placement of the water pump is detrimental on two fronts.

44.     First, as depicted below, in the event of a complete failure of the pump, all of the coolant that leaks across the pump shaft will leak directly into the crankcase below the water pump because there is nowhere else it could flow/pool.



45.     Second, the center placement of the water pump means that the weep port conduit (i.e., the channel in which coolant flows from the pump, through the engine block, and discharges outside the engine block) is both long and of small diameter. The weep hole is an engineered leak control and visual indicator of impending catastrophic pump failure, utilized in both internal and external water pumps. This combination of long length and small diameter makes the weep port conduit prone to blockage. Additionally, the weep hole in the water pumps installed in Class Vehicles is prone to blockage by debris shed from a failing pump. When weep holes are blocked, as in Class Vehicles, owners are unable to visually detect, and in turn remedy, water pump failures before such failures lead to more catastrophic results.

46.     Moreover, the weep port discharge is on the side of the engine block (not taking full advantage of gravity) near a concave surface contour where the coolant can pool. The problem here is that if the coolant pools in this area instead of pooling underneath the vehicle, the coolant leak will not be noticed by the vehicle operator.

47.     The design of the Cyclone Engine in Class Vehicles also differs significantly from designs used in certain other manufacturers' engines with internal water pumps. In certain other designs, the crank case and oil pan are set back from the timing cover, preventing any leak from the water pump from seeping directly into the oil pan, mixing with the oil, and destroying the engine. This avoids engine failure in the event of internal water pump failure.

48.     For comparison, the internal water pump used in the Subaru Boxer Engines Flat 6 (EZ30D) (produced from 2003-2009) is located to the right of the crankshaft, offset from the center of the engine. For this engine, the length of the weep port conduit is relatively short and less prone to blockage. In addition, the weep port discharge is towards the bottom of the engine, which is an optimal location for the coolant to pool underneath the vehicle, easily visible to the vehicle operator.

49.     Additionally, in the Class Vehicles, the elastomer bellows used in the mechanical seal are perpetually immersed in coolant. It is well-known that the mechanical properties of elastomers are known to degrade over time by exposure to

19

elevated temperatures and coolant chemical attack, and should not be immersed unshielded in coolant. As a result of this perpetual immersion and degradation of the bellows, the ability to prevent leaks is compromised over time. To counteract this, Defendant should have used elastomer bellows embedded in a metal shield so that the bellows are protected from the coolant.

50.     The water pump in Class Vehicles also defectively incorporates the use of an unreinforced bearing oil seal. This, in turn, allows coolant that has leaked across the mechanical seal to penetrate the bearing seal, which contaminates and washes out the bearing lubricant. Defendant failed to use a water pump with a reinforced bearing oil seal that would have prevented contamination from the environment which, in turn, would have prevented bearing failure.

51.     Examination of failed water pumps pulled from Class Vehicles has revealed the following probable failure mode as a result of the above described defects:

52.     The mechanical properties of the elastomer bellows degrade over time (owing to thermal/chemical/mechanical degradation).

53.     The combination of degradation and high dynamic loading on the elastomer bellows leads to the formation of a fatigue crack in the bellows. The fatigue crack is the source of coolant leakage across the mechanical seal.

54.     The leak through the fatigue crack is large enough such that: (1) the leak is not contained by the weep hole (either the weep hole is blocked by debris or the leak volume is too large); or (2) the leak is contained but moisture levels at the bearing seals are elevated.

55.     The coolant leak (or elevated moisture levels) penetrates the bearing seal, which contaminates and washes out the bearing lubricant. Once the lubricant is washed out, the bearings fail.

56.     Now operating with failed bearings, the mechanical seal becomes completely compromised, the pump fails completely, and coolant leaks through the pump drive shaft and into the crankcase and oil pan where it is mixed with the engine oil.

57.     This sets in motion a chain of reactions and events that reduces the lubricating properties of the oil.

58.     Even more concerning, the engine cooling system in the Class Vehicles is designed in a manner that causes coolant from a failed or failing water pump to leak into/on engine parts, including, *inter alia*, the timing chain, crankcase, and/or oil pan. The Water Pump Defect allows coolant to mix with the engine oil, and the mixture can then spread throughout the entire engine. This often causes immediate catastrophic engine failure, without the operator of the vehicle having any prior notice of the problem or of the imminent failure.

21

59.     As shown below, this mixture of oil and coolant resulting from the Water Pump Defect has been described as a "chocolate milk" substance, which is devastating to an engine:



60.     Once this substance has spread throughout an engine, the engine will seize, and replacement of the entire engine is required. This often occurs while the vehicle is being driven, with no warning to drivers of the Class Vehicles, and poses a safety risk when the engine suddenly fails during operation.

61.    Ford provides no warning to Plaintiff and members of the Class regarding the Water Pump Defect and associated safety risk. Rather, Ford publishes owner's manuals and maintenance schedules which do not specifically disclose that the water pump requires costly service, repair, or replacement during at least the first 150,000 miles of the Class Vehicles' lives in order to avoid catastrophic engine failure.[4] Ford's maintenance schedules inform customers of the parts that are required to be maintained or replaced at certain intervals, up to 150,000 miles, and

---

[4] *See, e.g.*, Exhibit D (2007 Model Year Scheduled Maintenance Guide); Exhibit E (2008 Model Scheduled Maintenance Guide); Exhibit F (2009 Model Year Scheduled Maintenance Guide); Exhibit G (2010 Model Year Scheduled Maintenance Guide); Exhibit H (2011 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2011/Ford/Explorer/31 (a screenshot of this interactive website showing the suggested maintenance at 150,000 miles has been provided); Exhibit I (2012 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2012/Ford/Explorer/31 (same); Exhibit J (2013 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2013/Ford/Explorer/31 (same); Exhibit K (2014 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2014/Ford/Explorer/31 (same); Exhibit L (2015 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2015/Ford/Explorer/31 (same); Exhibit M (2016 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2016/Ford/Explorer/31 (same); Exhibit N (2017 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2017/Ford/Explorer/31 (same); Exhibit O (2018 Ford Explorer Maintenance Schedule), available at: https://owner.ford.com/tools/account/maintenance/maintenance-schedule.html#/ymm/2018/Ford/Explorer/31 (same).

make no reference to the water pump. Instead, Ford implicitly represents that the water pump is expected to last for the useful life of the engine, or at least 150,000 miles, without the need for maintenance, repair, or replacement. As a result, Plaintiff and members of the Class relied on Ford's representations that the water pumps in the Class Vehicles do not need to be repaired or replaced before the Class Vehicles reach 150,000 miles.

62.     A water pump by itself, for the Cyclone Engine, one of which is shown below as part 8501, retails for approximately $200 (excluding labor):[5]



---

[5] *See Engine Water Pump*, FORD, https://parts.ford.com/shop/en/us/pump-assy-water-6347575-1 (last visited Oct. 5, 2022).

63.     However, as noted above, the location of the water pump in Class Vehicles makes it labor-intensive and extremely expensive to replace. Numerous engine components, including, *inter alia*, the timing chain, guides, and cover, have to be removed in order to access the water pump. Given the internal placement of the water pump, replacing the water pump in the Cyclone Engine typically requires at least 12-14 hours of work, at an expense of over $1,500.

64.     While unreasonable, this expense pales in comparison to the expense of replacing the entire engine as a result of the Water Pump Defect, as depicted in the image below, which can range from $4,000-$9,000 for a replacement engine.



65.    As alleged herein, Plaintiff and members of the New York Class purchased vehicles that contain the undisclosed Water Pump Defect and suffered actual damages, including overpayment damages, cost of repair damages and/or diminished market value, related to their purchase of the Class Vehicles as a direct result of Defendant's misrepresentations and/or omissions regarding the standard, quality, and/or grade of the Class Vehicles and/or the existence of the Water Pump Defect and its associated safety risk. The fact that the Class Vehicles contain the Water Pump Defect is material to Plaintiff and members of the Class because it leads to a serious safety risk, exorbitant repair or replacement costs, and diminishes the value of the Class Vehicles. Plaintiff and members of the New York Class would not have purchased the Class Vehicles, or would have paid less for the Class Vehicles, had Ford disclosed the Defect at the point of sale.

66.    In stark reminder of the magnitude and scope of the problem, since commencing this action on August 14, 2018, Plaintiff's counsel has been contacted by over 2,400 consumers about water pump problems in Class Vehicles. Among them, many consumers reported numerous ways that a water pump failure and/or catastrophic engine failure in their Ford, Lincoln, and Mercury vehicles have created grave safety concerns and personal and financial hardships in their daily lives. A sample of these complaints include:

- An individual contacted Plaintiff's counsel on August 14, 2019 and reported that his 2011 Ford Flex experienced complete loss of power at

90,950 miles, without warning, while he was driving with his wife and two young children in the car at high speed on an interstate highway, several miles from their home. They were ¼ of a mile from entering a construction zone where there were no roadway shoulders. They needed to have the car towed off the highway and rent a U-Haul to tow the vehicle home where it was diagnosed as having had a water pump and timing chain failure, resulting in catastrophic engine failure. This individual is still making payments on the vehicle and had to pay additional money to have the damaged engine replaced.

- The owner of a 2011 Ford Edge contacted Plaintiff's counsel on June 7, 2019 and reported that he was driving from Texas to Louisiana on an interstate highway when his car died with a little over 109,000 miles on it. He drifted to the side of the highway, and upon opening the hood, he saw that the coolant tank was empty and had leaked into the oil, turning it into a "milky" consistency. After towing the car back to Louisiana, he pulled the oil pan from the car and saw that it had metal shavings throughout and it appeared that the water pump had disintegrated into the oil.

- An owner of a 2011 Ford Edge contacted Plaintiff's counsel on July 30, 2019 and reported that he was traveling from Kansas to Florida on vacation with his family when the coolant light and engine oil pressure light came on. After finding a safe place to pull over along the roadway, he added coolant to the reservoir and it "gushed" back out. The vehicle was towed to a nearby mechanic in Tennessee where it was left while they returned to Kansas. When the car was returned to Kansas, he was told the engine needed to be replaced. The car has approximately 125,000 miles on it.

- An individual contacted Plaintiff's counsel on August 12, 2019 and reported that he recently experienced catastrophic engine failure for a second time in the same 2010 Ford Edge. He stated that he purchased the car new from a Ford dealer and has followed the maintenance schedule suggested by Ford. This individual stated that his water pump first failed at approximately 90,000 miles, causing catastrophic engine failure, only to be replaced by a new engine and water pump, which then failed in August 2019 after just 60,000 miles.

- The owner of a 2011 Ford Edge contacted Plaintiff's counsel on May 8, 2019 reporting that she was returning from a trip with the cruise control set when the RPMs started to ramp up and the engine started to

"skip." After pulling into a nearby gas station and opening the coolant tank, the remaining liquid was sucked into the engine like a vacuum. She paid to have her car towed 120 miles back to her home and was quoted $6,800 for a new engine. The car has roughly 100,000 miles on it.

- On August 13, 2019, Plaintiff's counsel was contacted by the owner of a 2011 Ford Edge who reported that she was traveling with her wife on an interstate highway at 65 MPH when there was a noise from under the hood. Her wife was able to pull the car safely over the shoulder where the car died with 111,000 miles on it. She had the car towed to the nearest mechanic who advised her that the water pump had failed and flooded the engine with coolant and metal shavings.

- On June 3, 2019, the owner of a 2011 Ford Explorer contacted Plaintiff's counsel and reported that she was traveling with her five and six-year-old children when her car lost power in a thunderstorm without warning. She "limped" the car off the main road into a local pizzeria parking lot and had it towed from there to her local mechanic. Her mechanic advised her that the water pump failed and destroyed the engine. The car had 134,000 miles on it.

- An individual contacted Plaintiff's counsel on July 16, 2019 reporting that she recently experienced catastrophic engine failure in her 2011 Ford Edge as a result of a failed water pump. The car has approximately 100,000 miles on it. This individual currently works two jobs to make ends meet and had to withdraw retirement funds to pay for the engine replacement. She has lingering concerns that she will have the same water pump problem with the replacement engine as well. Over the past month, she has been borrowing cars and asking for rides from friends and family so she can get to and from work.

- An individual contacted Plaintiff's counsel on August 9, 2019 reporting that she experienced catastrophic engine failure due to a faulty water pump on her 2011 Ford Edge. The car has 135,000 miles on it. This individual continued making car payments for several months as the vehicle sat dead in her backyard while trying to secure financing for a new engine for the vehicle. While her car was dead, she had to rely on public transportation to commute to and from work.

- The owner of a 2011 Ford Edge contacted Plaintiff's counsel on August 9, 2019 and reported that her vehicle completely shut down at an intersection, requiring bystanders to help her push the car out of the

28

intersection to avoid collision from oncoming traffic. This owner was told that her car required a new engine, costing approximately $7,500.

67.    As a result of Defendant's fraudulent concealment and material omissions, including its failure to disclose the presence of the Water Pump Defect in the Class Vehicles, Defendant has caused Plaintiff and members of the Class to suffer actual damages, including, but not limited to, overpayment damages, cost or repair damages, out-of-pocket expenses and/or the diminished value of their vehicles. As evident from the above, and other facts recited herein, Defendant also placed Plaintiff's and other Class members' lives in danger.

### C.    Defendant Touted Reliability, Quality, and Safety in Its Marketing and Advertising

68.    Defendant engages in direct marketing to consumers, such as Plaintiff and members of the Class, via television and radio commercials, print advertising, and the publication of vehicle brochures which are distributed through its network of authorized Ford dealerships, in order to induce consumers to purchase its vehicles. This comprehensive advertising campaign is ongoing.

69.    Through this direct advertising campaign, Defendant purports to build reliable, high quality, and safe vehicles. Defendant's customers are well aware of Ford's slogan it uses to describe its vehicles—"Built Ford Tough":



70.     Specifically, Ford represented to consumers that "[i]mproving quality is a daily priority at Ford" and that "[f]rom design and manufacture to sales and service, Ford always aims to increase customer satisfaction."[6] Defendant further informs consumers that it has "a longstanding commitment to developing and implementing innovations that make our vehicles safer for our customers and their families."[7]

71.     Similarly, Defendant has stated that "[s]afety continues to be one of the highest priorities in the design of our vehicles, and quality is a critical aspect of customer safety – and therefore of our responsibilities and success as a company"

---

[6] *Our Company*, FORD, https://web.archive.org/web/20180327120357/http://corporate.ford.com:80/company.html (last visited Oct. 5, 2022).
[7] *Id.*

and that the Company "continue[s] to produce high-quality, smart, clean and safe vehicles."[8]

72.    Likewise, Defendant has stated that "[q]uality is at the heart of everything we do, and it drives ongoing improvements across all functions while delivering high-quality vehicles that our customers want and value."[9]

73.    In advertising for Class Vehicles on Ford's website during the times in which the vehicles were sold, Defendant repeatedly touted the safety of the Class Vehicles, claiming for example, *inter alia*, that the 2010 Ford Edge was a "Top Safety Pick," the 2010 Ford Explorer offered "Five Star Safety" and the 2012 Ford Flex included "advanced safety features":

---

[8]    *Sustainability    Report    2017/18*,    FORD, https://web.archive.org/web/20181224164026/https://corporate.ford.com/content/d am/corporate/en/company/2017-18-Sustainability-Report/sr17.pdf (last visited Oct. 5, 2022).
[9] *Id.*







74.     Defendant made such claims while knowing that it was selling, and has sold, thousands of Class Vehicles equipped with the Water Pump Defect and corresponding safety risk. These claims helped Defendant to conceal the Defect's existence in order to sell more vehicles, avoid the financial responsibility of repairing and/or replacing defective water pumps or any engine components damaged by the water pump's failure, and transfer those costs to Plaintiff and New York Class members.

**D.     Defendant's Knowledge of the Defect and Associated Safety Risk**

75.     Ford knew of the Defect and the associated safety risk prior to the sale of any Class Vehicle.

76.     Defendant fraudulently and intentionally omitted and concealed from Plaintiff and members of the Class the Defect in the Class Vehicles even though Defendant knew or should have known of the Water Pump Defect in Class Vehicles.

77.     Knowledge and information regarding the Water Pump Defect were in the exclusive and superior possession of Ford, its partner Mazda, and their dealers, and that information was not provided to Plaintiff and members of the Class. Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, early consumer complaints made to Defendant's and Mazda's network of exclusive dealers, aggregate warranty data compiled from those dealers, repair orders and parts data received from the dealers, consumer complaints to dealers and NHTSA, and testing performed in response to consumer complaints, *inter alia*, Defendant was aware (or should have been aware) of the Water Pump Defect in the Class Vehicles and fraudulently concealed the Defect and safety risk from Plaintiff and members of the Class.

78.     Defendant knew, or should have known, that the Water Pump Defect and the associated safety risk was material to purchasers of Class Vehicles and was not known or reasonably discoverable by Plaintiff and members of the Class before they purchased Class Vehicles or within the applicable warranty periods.

79.     Notwithstanding Defendant's exclusive and superior knowledge of the Water Pump Defect, Defendant failed to disclose the Defect to consumers at the time

of purchase of the Class Vehicles (or any time thereafter) and continues to deny the existence of the Defect. Defendant intentionally concealed the Defect and that the Defect presents a safety risk to consumers, including Plaintiff, members of the New York Class, and the public.

### 1. Defendant Knew that a Defect in the Class Vehicles' Water Pump Had the Potential to Cause Catastrophic Engine Failure Given the Water Pump's Design and Location

80. Ford knew during the design and pre-production stages of the Class Vehicles that the failure of a Class Vehicle's water pump could pose a significant safety risk to the Class Vehicles' driver and occupants.

81. As explained above, as a result of the water pump's design and location, when the water pump fails in the Class Vehicles, coolant is able to escape from the closed engine cooling system and leak into the oil pan and/or other engine components, allowing it to mix with the engine's oil. Also, as explained above, when coolant mixes with engine oil, the mixture is carried throughout other parts of the engine where it causes friction and leads to sudden, catastrophic engine failure.

82. It is common knowledge among vehicle manufacturers, such as Ford, that catastrophic engine failure causes a vehicle to lose engine power, including the ability to accelerate, maintain speed, readily control steering and/or fully engage the brakes.

83.     It is also common knowledge among vehicle manufacturers, such as Ford, that a loss of engine power while the vehicle is in operation can result in an accident and cause serious injury or even death to the occupants of the vehicle, as well as others on the road.

84.     Thus, Ford knew that as a result of the design and location of the water pump in the Class Vehicles, a failure of the water pump could subject Class members and any other occupants of the Class Vehicles to an unreasonable risk of harm.

85.     In addition, Ford knew during the design and pre-production stages of the Class Vehicles that as a result of the design and location of the water pump in the Class Vehicles, potential problems with the water pump, such as leaks, weeps, cracks, and damage could not be easily identified during routine service inspections, even those conducted by Ford's own mechanics.

86.     As explained above, because the water pump in the Class Vehicles is internally located within the Class Vehicles' engine and behind numerous engine components, including the timing chain cover, the water pump is hidden from view during routine maintenance or service within the engine compartment.

87.     Ford also knew during the design and pre-production stages of the Class Vehicles that as a result of the design and location of the water pump in the Class Vehicles, if catastrophic engine failure occurred as a result of problems with the

water pump, the operator of the Class Vehicle would not have any prior notice of the problem or of the imminent engine failure.

88.     Also as explained above, because the water pump in the Class Vehicles is located internal to the engine block, when the water pump fails, notice of the failure is not provided to the operator of the Class Vehicle in the form of coolant leaking onto the ground or dashboard warning lights indicating that the Class Vehicle is overheating. Instead, when a Class Vehicle's internal water pump fails, because all of the coolant that leaks from the water pump will leak directly into the crankcase below the water pump (instead of pooling underneath the vehicle where the water pump is located external to the engine block), it will not be visible to the operator of the Class Vehicle. Moreover, because the failure of a Class Vehicle's water pump often causes immediate engine failure, by the time dashboard warning lights appear, the catastrophic engine failure has already occurred.

89.     Thus, Ford knew that as a result of the design and location of the water pump in the Class Vehicles, if the water pump failed, it would be difficult, if not impossible, for the operator of the Class Vehicle to take action to prevent the catastrophic engine failure and resulting risk of harm.

90.     Accordingly, prior to the sale of the Class Vehicles, Ford was on notice of the Defect and the potential problems and safety risks posed by the Defect in the Class Vehicles' water pumps given the design and location, and would have been

keenly aware of any complaints made by purchasers and lessees of the Class Vehicles that reported incidents of water pump failure and catastrophic engine failure related to the failure of the Class Vehicles' internal water pumps.

**2.    Defendant Knew About the Water Pump Defect Based on the Volume of Complaints filed with NHTSA**

91.    Class Vehicle purchasers and lessees have filed numerous complaints with NHTSA reporting the Water Pump Defect, the need to pay exorbitant amounts to repair or replace the water pump and damaged engine parts, and detailing their experiences of catastrophic engine failure, which put the safety of drivers and their passengers at risk.

92.    Federal law requires Ford to monitor defects which can cause a safety issue and report them within five (5) days. *See* 67 FR 45822 (2000) (*amending* 49 U.S.C. § 30166(e) (1994)). In fact, manufacturers like Ford are obligated to maintain sufficient systems to track reports of defects. Ford regularly monitors NHTSA complaints and tracks those reports in a system to meet its reporting requirements under federal law and was provided knowledge of the defect prior to and/or within the express warranty time and mileage limitations through these complaints, *inter alia*.

93.    By June 2020, NHTSA had received approximately 200 complaints regarding water pump failures in Ford and Mazda vehicles containing the Cyclone Engine.

94.    As reflected in the below chart, the vast majority of the water pump failures in those vehicles occurred well before the useful life of the engine, which is 150,000 miles, but just after the express warranty's mileage limitation would have expired:



95.    Notably, the average mileage reported for the water pump failures at issue in those complaints was only 102,957 miles. The median (50th percentile) mileage reported was 100,000 miles, so half the water pump failures occurred before 100,000 miles. In other words, half the water pumps in the Ford and Mazda vehicles containing the Cyclone Engine failed over 50,000 miles prematurely and over 33% prior to the engine's useful life.

96.     In fact, as reflected in the below table, approximately 91% of water pump failures occurred before 150,000 miles of service, 57% of water pump failures occurred before 105,000 miles of service, 38% of water pump failures occurred before 90,000 miles of service, and 17% of water pump failures occurred before 75,000 miles of service:

### Tally

| Recoded Mileage | Count | Percent | CumPct |
|---|---|---|---|
| 1 <=36,000 | 5 | 2.87 | 2.87 |
| 2 36,001-60,000 | 11 | 6.32 | 9.20 |
| 3 60,001-75,000 | 14 | 8.05 | 17.24 |
| 4 75,001-90,000 | 36 | 20.69 | 37.93 |
| 5 90,001-105,000 | 34 | 19.54 | 57.47 |
| 6 105,001-120,000 | 24 | 13.79 | 71.26 |
| 7 120,001-135,000 | 22 | 12.64 | 83.91 |
| 8 135,000-150,000 | 12 | 6.90 | 90.80 |
| 9 >150,000 | 16 | 9.20 | 100.00 |
| N= | 174 | | |
| *= | 5 | | |

97.     Defendant would, or should, have had knowledge of this information, as Defendant would have received orders for replacement parts and communications through authorized dealerships concerning these failures. Moreover, the above failures only reflect the mileage at failure as reported to NHTSA, and are thus likely higher than the true average failure mileage amount because Class Vehicle purchasers whose vehicles failed while under warranty would be less likely to report their concerns to NHTSA.

98.     Below are excerpts of a small sample of consumer complaints made to

NHTSA regarding the Water Pump Defect in Class Vehicles:

- **January 14, 2014 – 2010 Ford Fusion**

    I HAD JUST HA THE OIL CHANGED AT THE FORD DEALERSHIP IN MORROW, GA. WHO ALWAYS DO AND INSPECTION TO SEE IF THERE ARE OTHER SERVICES NEEDED, WHICH THEY FOUND NO ONE. TWO WEEKS LATER ON MY WAY HOME THE ENGINE RAN HOT. AS IT TURNS OUT THE WATER PUMP HAD FAILED BECAUSE OF PLASTIC IMPELLERS THAT ARE IN THE WORKMANSHIP. CALL FORD IN DETROIT TO INQUIRE AND THEY INFORMED ME THAT THERE WAS NO RECALL BECAUSE OF THE PROBLEM. I'M NOT SURE IF OTHER OWNERS HAVE HAD THE SAME FAILURE WITH THIS CAR OR NOT, BUT I WOULD LIKE TO KNOW.

- **January 16, 2014 – 2008 Ford Edge**

    TL* THE CONTACT OWNS A 2008 FORD EDGE. THE CONTACT STATED THAT THE WATER PUMP MALFUNCTIONED AND LEAKED INTO THE ENGINE, CAUSING THE ENGINE TO FAIL. THE CONTACT TOOK THE VEHICLE TO A DEALER TO HAVE THE ENGINE REPLACED. THE CONTACT DID NOT HAVE ANY ISSUES WITH THE ENGINE AFTER THE ENGINE WAS REPLACED. THE MANUFACTURE WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 125,300.

- **July 16, 2014 – 2008 Ford Edge**

    DISCOVERED MY 2008 EDGE HAS A FAILED WATER PUMP ASY. CAR OVERHEATED DUE TO THIS. ACCORDING TO SEVERAL SEASONED MECHANICS AND FORD, THIS SHOULD NOT HAPPEN TO THIS CAR WITH THIS AMOUNT OF MILEAGE. THE WAY THIS CAR WAS ENGINEERED, IT IS A $2300+ REPAIR - FOR A WATER PUMP! SPOKE WITH FORD SEVERAL TIMES ASKING FOR THEM TO STEP-UP AND TAKE RESPONSIBILITY. GOT NO HELP EXCEPT I SHOULD KEEP MY RECEIPTS. VERY DISAPPOINTED IN FORD.

- **September 5, 2014 – 2007 Ford Edge**

  THE VEHICLE BEGAN TO OVERHEAT RAPIDLY AND THE AIR CONDITIONING BEGAN TO PUT OUT HOT AIR. I PULLED THE VEHICLE OFF OF THE ROAD AND TURNED EVERYTHING OFF. UPON COOLING DOWN, WATER WAS ADDED TO THE RADIATOR AND THE VEHICLE WAS TAKEN TO THE MECHANIC. THE PROBLEM WAS AN INTERNAL WATER PUMP. THE WATER PUMP COST $1900 TO HAVE REPLACED. I CONTACTED FORD AND THEY SAID THEY CANNOT DO ANYTHING, IT IS THE DESIGN AND HOW YOU HAVE TO ACCESS THE WATER PUMP. I PRICED (3) DIFFERENT DEALERS ON THE REPAIR AND THEY WERE ALL WITHIN A FEW DOLLARS OF EACH OTHER. THIS PARTICULAR VEHICLE HAS NOT BEEN RELIABLE.

- **September 19, 2014 – 2008 Ford Edge**

  WITHOUT ANY WARNING OR CODES, THE CAR STOPPED RUNNING. UPON RESTART THE FAN RAN EXTREMELY FAST AND LOUD. UPON INSPECTION, THE WATER PUMP GASKETS HAD ESSENTIALLY MELTED, ALL COOLANT HAD LEAKED OUT AND THE ENTIRE COOLANT/WATER PUMP SYSTEM NEEDED TO BE FIXED AND REPLACED AT A COST OF MORE THAN $3,000. OF COURSE THE VEHICLE WAS ONLY 8,000 MILES OUT OF WARRANTY. I'VE SEEN AT LEAST ONE OTHER COMPLAINT IDENTICAL TO THIS ONE. IT IS QUOTED HERE: "DISCOVERED MY 2008 EDGE HAS A FAILED WATER PUMP ASY. CAR OVERHEATED DUE TO THIS. ACCORDING TO SEVERAL SEASONED MECHANICS AND FORD, THIS SHOULD NOT HAPPEN TO THIS CAR WITH THIS AMOUNT OF MILEAGE. THE WAY THIS CAR WAS ENGINEERED, IT IS A $2300+ REPAIR - FOR A WATER PUMP! SPOKE WITH FORD SEVERAL TIMES ASKING FOR THEM TO STEP-UP AND TAKE RESPONSIBILITY. GOT NO HELP EXCEPT I SHOULD KEEP MY RECEIPTS. VERY DISAPPOINTED IN FORD."

- **September 24, 2014 – 2011 Ford Taurus**

  THE CONTACT OWNS A 2011 FORD TAURUS. WHILE DRIVING 65 MPH, THE AIR CONDITIONER BECAME INOPERABLE AND THE ANTIFREEZE LEAKED WITHOUT WARNING. THE VEHICLE WAS TOWED TO AN INDEPENDENT MECHANIC.

THE TECHNICIAN DIAGNOSED THAT THE WATER PUMP NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 95,000.

- **October 06, 2014 – 2012 Ford Fusion**

  BOUGHT A 2012 FORD FUSION BRAND NEW FROM A DEALERSHIP. FIRST INCIDENT OCCURRED WITHIN FIRST 2 YRS OF OWNERSHIP WHILE DRIVING 45 MPH DOWN AN INCLINE - SUDDEN LOSS OF POWER. IT FELT AS IF IT LOST POWER STEERING AND THOUGHT ENGINE SHUT OFF. DASH ALARMS RANG AND BRIEFLY SAW 'POWER STEERING FAULT' LIGHT UP. TOOK ALL MY POWER TO PULL CAR OFF ROAD AND TO A SAFE COMPLETE STOP.TURNED OFF IGNITION. AFTER A FEW MINUTES RESTARTED IGNITION AND DROVE DIRECTLY TO A DEALERSHIP WITHOUT FURTHER INCIDENT. DEALERSHIP STATED WATER PUMP WAS DEFECTIVE AND SENT A SIGNAL TO THE ENGINE TO SHUT DOWN. PUMP WAS REPLACED SECOND INCIDENT OCCURRED MONTHS LATER WHILE AT A COMPLETE STOP AT A TRAFFIC LIGHT. STEERING WHEEL SUDDENLY LOCKED, AND FELT ENGINE POWER REDUCE. DASH WARNING SOUNDED AND SAW 'POWER STEERING FAULT, SERVICE POWERTRAC' LIGHT UP. TURNED IGNITION OFF AND BACK ON AND WAS ABLE TO DRIVE TO DEALERSHIP WITHOUT FURTHER INCIDENT. WAS TOLD A CHIP REPLACEMENT WAS ISSUED. REPLACED CHIP AND WAS TOLD THAT WOULD EXTEND THE WARRANTY AND RESOLVE ISSUE. CONTINUE TO HAVE ADDITIONAL INCIDENTS (4 TO DATE ) BOTH WHILE MOVING AND AT A STAND STILL WHERE THE DASH WARNING SOUNDED AND FELT A REDUCTION OR LOSS OF POWER, EACH TIME HAVING TO SHUT OFF IGNITION AND RESTART TO CLEAR THE FAULT. DEALERSHIP CONTINUES TO ATTEMPT TO SERVICE WITH NO RESOLVE AS YET.

- **December 9, 2014 – 2010 Ford Taurus**

  MY VEHICLE SUDDENLY RAN HOT WHILE DRIVING ON THE INTERSTATE AT APPROXIMATELY 65 MPH. I IMMEDIATELY PULLED OFF AS MY EXIT WAS APPROACHING AND WITHIN

1/2 FOUND A SAFE PLACE TO PARK. THE ENGINE HAD STEAM COMING FROM THE RADIATOR. AFTER CALLING AAA FOR A TOW, IT WAS TOWED TO THE LOCAL AAA AND THEN TO THE CLASSIC FORD DEALERSHIP. AS THE CAR ARRIVED ON A FRIDAY, FORD DID NOT CHECK IT UNTIL THE FOLLOWING TUESDAY. I RECEIVED A QUOTE FROM FORD THAT IT NEEDED AN ENTIRELY NEW ENGINE, TIMING BELT AND WATER PUMP FOR $7, 400.00! CALLS TO THE CORPORATE FORD DID NO GOOD AS THEY SAID THERE WAS NOTHING THAT FORD COULD DO BUT TO KEEP MY RECEIPTS IN CASE A RECALL WAS EVER ANNOUNCED. I CALLED ANOTHER MECHANIC THAT I HAD USED IN THE PAST AND HE WAS ABLE TO FIX THE ENGINE FOR $1800.00. THE MECHANIC SAID THAT THE ENGINE DESIGN WAS FAULTY AND THAT IF IT EVER RAN HOT AGAIN, IT WOULD DO THE SAME DAMAGE BECAUSE OF THE DESIGN.

- **March 12, 2015 – 2008 Ford Edge**

  THE WATER PUMP IS LOCATED INSIDE THE ENGINE AND WHEN A SIMPLE $160 PART FAILED, IT CIRCULATED ANTI-FREEZE THROUGH THE ENGINE NECESSITATING A COMPLETE ENGINE REPLACEMENT. THIS HAPPENED WITHIN THE SPAN OF 5 MINUTES WITH THE FIRST SYMPTOM THE HEAT WENT OFF INSIDE THE CABIN. NO ENGINE LIGHTS CAME ON, THE HEAT CAME BACK ON AND WENT OFF AGAIN, STILL NO INDICATION OF ENGINE OR TROUBLE LIGHTS GOING ON. THEN MAJOR ENGINE FAILURE, INSTANTLY THE OIL LIGHT WENT ON AND WITHIN SECONDS THE MOTOR OVERHEATED. THERE WAS A TERRIBLE NOISE AS I FOUND MY WAY TO A SAFE SPOT TO STOP THE CAR. THIS IS THE MOST BASIC KIND OF IRRESPONSIBILITY IN CREATING AN EXPENSIVE PRODUCT LIKE A CAR. AMERICAN COMPANIES OWE IT TO THE PUBLIC NOT TO FOIST A HUGE DESIGN DEFECT ON AN UNSUSPECTING PUBLIC AND SHOULD WILLINGLY PAY 100% OF ANY AND ALL CLAIMS FOR THIS ISSUE.

- **April 2, 2015 – 2015 Ford Taurus**

  THE CONTACT OWNS A 2015 FORD TAURUS. AFTER DRIVING THE VEHICLE, A STRONG ABNORMAL ODOR EMITTED FROM

THE HOOD. WHEN THE CONTACT OPENED THE HOOD, THE STEAM WAS SO HOT THAT HE COULD NOT TOUCH THE RADIATOR HOSE. THE VEHICLE WAS TAKEN TO THE DEALER. THE TECHNICIAN STATED THAT THE WATER PUMP WAS PLACED IN A DIFFERENT LOCATION FROM PREVIOUS OLDER MODELS CAUSING THE RADIATOR TO EMIT HIGHER HEAT. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE FAILURE MILEAGE WAS 300.

- **September 3, 2015 – 2013 Ford Taurus**

  THE CONTACT OWNS A 2013 FORD TAURUS. WHILE DRIVING APPROXIMATELY 60 MPH, THE COOLANT WARNING LIGHT ILLUMINATED. THE CONTACT NOTICED COOLANT LEAKING FROM THE FRONT OF THE VEHICLE. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC FOR DIAGNOSTIC TESTING. THE MECHANIC STATED THAT THE COOLANT WAS LEAKING FROM THE FREEZE PLUG AND WATER PUMP, AND BOTH NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 82,000.

- **September 30, 2015 – 2013 Ford Fusion**

  FIRST PROBLEM WITH THE CAR WAS HAVING PROBLEMS WITH FIRST STARTING IT IN THE MORNING WITH IT ACTING AS IF IT WASNT GETTING GAS UNTIL I STEPPED ON THE ACCELERATOR WHILE IN PARK, DEALERSHIP CLAIMED IT WAS A CRACKED WATER PUMP. THEN THE CHECK ENGINE LIGHT CAME ON WHILE DRIVING, THEY REPLACED HEAD GASKET AND INTAKE GASKET DUE TO THE CODE FROM THE CHECK ENGINE LIGHT. THEN THE CAR STOPPED ACCELERATING ON THE INTERSTATE AND WHEN I PULLED OVER AND TURNED IT OFF IT MADE LOUD CRACKING NOISES AND WOULDNT START. DEALERSHIP SAYS A PIECE UNDERNEATH THE WATER PUMP FELL OFF THEY BELIEVE IT WAS DEFECTIVE BECAUSE THE BOLT WAS HALF THE SIZE IT WAS SUPPOSE TO BE AND RUINED THE ENGINE. FIRST PROBLEMS STARTED IN MAY UNTIL MOST RECENT ONE IN SEPT.

- **October 6, 2015 – 2010 Ford Fusion**

    WHILE DRIVING I NOTICED THE TEMP GAUGE WAS ON HIGH. NO WARNING LIGHTS PRECEDING THIS AND NOW LOW COOLANT ALARM. TURNED A CORNER TO PULL OFF AND BEFORE I COULD, CHECK ENGINE LIGHT CAME ON AND ENGINE SHUDDERED TO A STOP CAUSING ME TO LOOSE STEERING AND BRAKES. WITH NO WARNING ENABLING ME TO EITHER CHECK THE CAR OUT, OR SAFELY GET OFF THE ROAD. THE WATER PUMP WHICH IS INSIDE THE ENGINE FAILED. IT HAS CONTAMINATED THE OIL NOW REQUIRING AN ENTIRE NEW ENGINE. ON SEARCHING GOOGLE FOR THE FORD 3.5L V6 ENGINE THIS APPEARS TO BE A HUGE PROBLEM WITH THESE ENGINES AND ITS DESIGN. I CANT IMAGINE WHAT WOULD HAPPEN SHOULD IT FAIL WITHOUT WARNING AT HIGHWAY SPEEDS.

- **October 26, 2015 – 2007 Ford Explorer**

    THE CONTACT OWNS A 2007 FORD EXPLORER. WHILE DRIVING 65 MPH, THE VEHICLE OVERHEATED AS HIGH TEMPERATURES WERE DISPLAYED ACROSS THE MESSAGE BOARD. IN ADDITION, THERE WAS AN INCREASE IN READING ON THE TEMPERATURE GAUGE. THE VEHICLE WAS TOWED TO A DEALER WHO WAS UNABLE TO DIAGNOSE OR REPAIR THE VEHICLE. THE VEHICLE WAS THEN TOWED TO ANOTHER DEALER WHO DIAGNOSED THAT THE RADIATOR, WATER PUMP AND HEATER CORE NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. HOWEVER, THE FAILURE PERSISTED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 123,000.

- **February 16, 2016 – 2011 Ford Edge**

    DRIVING TO WORK ABOUT TEN MILES OF HIGHWAY, MY CAR STARTED RUNNING ROUGH AND SHAKING. I WAS ABLE TO COAST INTO A PARKING LOT THEN MY HEATER STOPPED WORKING A WARNING LIGHT CAME ON "ENGINE COOLANT TEMP" THEN IT DIED COMPLETELY IN A MATTER OF SECONDS, I SAW SOME SMOKE UNDER THE HOOD SO I CALLED FOR HELP. THERE WAS NO OTHER WARNING WHATSOEVER! THE MECHANIC TOLD US THAT THE WATER

46

PUMP HAD GONE OUT AND CAUSED THE ENGINE TO OVER HEAT. IT SHOT COOLANT INTO THE ENGINE AND IT WAS TOTALED. AGAIN THERE WAS ABSOLUTELY NO WARNING AT ALL. NO SENSORS NO ANYTHING. I MAINTAIN MY VEHICLE WITH REGULAR OIL CHANGES ETC. AND IF THERE HAD BEEN ANY WARNING LIGHT I WOULD HAVE TAKEN IT TO MY MECHANIC IMMEDIATELY.

- **July 19, 2016 – 2011 Ford Explorer**

  LONG STORY SHORT, I PULLED OUT OF MY NEIGHBORHOOD GOT ABOUT A QUARTER OF A MILE DOWN THE ROAD. HEARD THE DRIVE BELT SQUEAL FOR ABOUT 15 SECONDS, FOLLOWED BY CHECK ENGINE LIGHT, AND EXTREME ENGINE KNOCK. THE VEHICLE WAS SHUT OFF IMMEDIATELY. THE CODES READ, CRANKSHAFT/CAMSHAFT CORRELATION BANK A SENSOR 1, THE SECOND CODE WAS ENGINE KNOCK. VEHICLE TOWED TO THE DEALER WERE THEY HAD 2 OF THEIR TOP TECHNICIANS LOOK AT THE VEHICLE AND THE BOTH REPORTED THE WATER PUMP HAD FAILED AND FILLED THE ENGINE UP WITH COOLANT WHICH CAUSE THE ENGINE TO EXPIRE. MY WIFE ONLY HAD THE TRUCK FOR 2 YEARS AND SHE'S VERY CAREFUL DRIVER. NO WARNING SIGNS OF A FAILING WATER PUMP. JUST GOT BACK FROM A 7HR ROAD TRIP A WEEK BEFORE THE WATER PUMP FAILED AND THE ENGINE EXPIRED.

- **December 28, 2016 – 2010 Ford Fusion**

  WITHOUT WARNING, DRIVING HIGHWAY SPEEDS WE LOST POWER. GOT THE CAR STARTED AGAIN AND REALIZED THERE WAS NO HEAT, THEN NOTICED THE TEMPERATURE GAUGE WAS ON HOT. THE BATTERY LIGHT, CHECK ENGINE LIGHT AND WRENCH LIGHT TURNED ON. WE EVENTUALLY HAD TO BE TOWED AT A COST OF $460. THE MASTER MECHANIC IDENTIFIED THE WATER PUMP CRACKED, THEN RESEALED ITSELF AND COOLANT MIXED WITH THE OIL WHICH KILLED THE ENGINE. HE SAID THERE WOULD HAVE NOT BEEN ANY WARNING AND THIS ISSUE HAS BEEN SEEN BEFORE AND IS CATASTROPHIC. WE NOW HAVE TO REPLACE THE ENGINE AT A COST OF $8000. THERE ARE

47

FORUMS ONLINE WITH OTHER FUSION OWNERS EXPERIENCING THE SAME ISSUE BUT NO RECOGNITION OR RECALL FROM FORD. I HAVE HAD ISSUES WITH THIS CAR SINCE THE DAY I BOUGHT IT. I HAD TO HAVE MY ELECTRONIC THROTTLE BODY REPLACED TWICE, ALSO NOT A RECALL BY FORD BUT A CUSTOMER SATISFACTION PROGRAM. I GUESS THEY ARE OK WITH HAVING CARS LITERALLY TURNING OFF AT HIGHWAY SPEEDS BEFORE THEY FIX THE ISSUES.

- **November 9, 2017 – 2013 Ford Fusion**

    ON WAY TO WORK I ON THE MORNING OF 10-12-17 GOING ABOUT 75MPH ON INTERSTATE AND ALL THE SUDDEN THERE WAS A DING AND FLASH OF RED (CHECK ENGINE LIGHT) ON THE DASHBOARD STATING ENGINE OVERHEATING AND ENGINE SHUT DOWN AND CAR BASICALLY WENT INTO NEUTRAL. I LOST ALL POWER, RADIO, LIGHTS ETC. WITH THE MOMENTUM I HAD BUILT UP GOING 75 I WAS ABLE TO MAKE IT ACROSS THE 4 LANES TO THE SHOULDER. AN OHIO STATE TROOPER STOPPED TO ASSIST AND WAS DUMB FOUNDED WHEN HE SAY THERE WAS NO POWER, THE CAR WOULD NOT TURN ON. I CALLED THE DEALERSHIP SPOKE WITH JAY AND ADVISED THAT CAR WAS BEING TOWED IN. SERVICE DEPARTMENT AT FORD IS STATING THAT IT'S A SAFETY FEATURE TO STOP FIRE FROM HAPPENING, BUT HONESTLY HOW SAFE IS TO HAVE THE ENGINE AND ALL ELECTRICAL POWER COMPLETELY SHUT DOWN ON INTERSTATE. IT WAS A MATTER OF SECONDS BETWEEN DING, LIGHT AND LOSS OF POWER.

- **June 19, 2018 – 2011 Ford Edge**

    WATER PUMP EXPLODED AND DESTROYED THE ENGINE WITH NO WARNING. THE CAR STOPPED WORKING AT 65 MILES AN HOUR ON THE HIGHWAY, LOST POWER, STEERING AND BRAKES. THE CAR WAS FULLY SERVICED AND PASSED INSPECTION ONLY 10 DAY BEFORE THE INCIDENT. THERE WAS NO WARNING BY INSTRUMENTS ON THE DASHBOARD. ONLY A LOSS OF POWER.

### 3.    Defendant Knew About the Water Pump Defect Based on the Severity of the Safety Risk Caused by the Water Pump Defect

99.    Notwithstanding the volume of NHTSA complaints, several NHTSA complaints also detailed grave safety concerns, which would or should have prompted Defendant to investigate further, including the following:

- **December 18, 2015 – 2010 Ford Flex**

   WHILE WAITING AT A LIGHT IN MY 2010 FORD FLEX THE ENGINE WAS IDLING ROUGH, AFTER THE SIGNAL TURNED GREEN THE POWER SEEMED LOW AND SLUGGISH AS I ACCELERATED. WHEN I WAS AT ABOUT 45 MPH THE ENGINE POWER RETURNED AND SEEMED MORE NORMAL, *SUDDENLY WITHOUT NOTICE THE ENGINE TURNED OFF AND ALL DASH LIGHTS ILLUMINATED. I WAS ABLE TO PULL INTO A DRIVE WAY BUT WAS VERY HARD AS THERE WAS NO POWER STEERING. I WAS ABLE TO COAST TO A STOP SAFELY.* ONCE STOPPED THERE WAS A VERY STRONG SMELL OF COOLANT. I OPENED THE HOOD AND FOUND A LARGE AMOUNT OF COOLANT ON RIGHT SIDE OF ENGINE. MY CAR WAS TOWED TO MY HOME TO FIGURE OUT WHAT THE ISSUE COULD BE. ON FURTHER INSPECTION IT IS SUSPECTED THAT THE WATER PUMP FAILED WHICH IS INTERNAL TO THE TIMING CHAIN COVER AND THEREFORE DUMPED A LARGE AMOUNT OF COOLANT INTO THE CRANKCASE WHICH THEN CONTAMINATED THE ENGINE OIL AND OVER FILLED THE OIL PAN. *I WAS FORTUNATE THAT THIS OCCURRED ON A CITY STREET AND NOT ON THE FREEWAY AS THIS COULD HAVE CAUSED A MAJOR ACCIDENT.* ON FURTHER RESEARCH I HAVE FOUND THIS HAS OCCURRED MANY TIMES.

- **September 14, 2016 – 2011 Ford Taurus**

   CATASTROPHIC WATER PUMP FAILURE LEAKED A LOT OF COOLANT IN OIL - *DRIVER WAS DRIVING THE CAR ON HIGHWAY WHEN ALL OF SUDDEN THE MOTOR JUST DIED (STALLED), FORCING THE DRIVER TO HARD STEER TO THE*

***SIDE OF HIGHWAY.*** THE GAUGE AT THE TIME JUST SUDDENLY JUMPED TO H - IN A SPAN OF FEW SECONDS AND ALL DASH LIGHTS ILLUMINATED. VERY LITTLE STEAM WAS COMING OUT - VERY LITTLE FLUID WAS LEAKING. NOTICED SMELL OF COOLANT RIGHT AWAY. LOOKED/DOUBLE CHECKED UNDER THE CAR - LITTLE LEAK AGAIN. IMMEDIATELY THOUGHT MAYBE WATER PUMP OR AT LEAST RADIATOR HOSE LEAK, CHECKED THE COOLANT - IT WAS EMPTY. HAD IT TOWED TO PAUL MILLER FORD IN LEXINGTON. VERY UNFRIENDLY CUSTOMER SERVICE. THEY MENTIONED THAT IT WAS A "CATASTROPHIC ENGINE FAILURE" - COOLANT HAD MIXED IN WITH THE OIL AND WAS PRETTY MUCH SITTING THERE. ***I WAS VERY FORTUNATE THAT THIS HAS NOT CAUSED A MAJOR ACCIDENT AS I EXPLAINED IT WAS REAL DIFFICULT TO DRIVE THE CAR AFTER IT STALLED.***

- **November 2, 2016 – 2011 Ford Explorer**

   HAVE EXTENSIVE ENGINE DAMAGE DUE TO WATER PUMP FAILURE WITH NO WARNING! ***I WAS DRIVING MY VEHICLE DOWN A MAIN HIGHWAY AND ALL OF A SUDDEN THE "ENGINE COOLANT OVERTEMP" CAME ON THEN "LOW OIL PRESSURE" AND MY VEHICLE SHUT DOWN! I COULDN'T DRIVE THE VEHICLE. LUCKILY I DRIFTED TO SIDE OF THE ROAD SO THAT MY CAR COULD BE TOWED WITHOUT HAVING AN ACCIDENT!*** SHOP DETERMINED WATER PUMP FAILURE AND WATER LEAKED INTO MY ENGINE POOR ENGINE DESIGN ON FORDS PART) AND DESTROYED THE ENGINE WITH NO WARNING! NO ENGINE LIGHT CAME ON OR ANYTHING. PLEASE INVESTIGATE THIS. THERE ARE NUMEROUS COMPLAINTS ABOUT THIS SAME SITUATION. I CALLED FORD TO COMPLAIN BUT ALL THEY DID WAS TAKE DOWN MY COMPLIANT. ***THIS IS A SAFETY ISSUE BECAUSE I WAS DRIVING IN TRAFFIC AND THIS COULD HAVE CAUSED AN ACCIDENT. THE WHOLE CAR JUST SHUT DOWN!***

- **February 6, 2017 – 2011 Ford Taurus**

   I HAD A INTERNAL WATER PUMP FAILURE FILLING THE ENGINE WITH COOLANT. THIS RESULTED IN A ENGINE

HYDRO LOCK CONDITION (LUCKILY I WAS ABLE LIMP A VERY ROUGH RUNNING CAR IN THE EMERGENCY LANE AT 15MPH TO A NEARBY EXIT). HAPPENED FRIDAY EVENING FEB 3RD 2017 ON A COLD 27 DEGREE EVENING. I WAS STRANDED NORTH OF NASHVILLE, TN ON I65. THIS IS A VERY VERY BAD DESIGN FLAW . . . LEARNING NOW IT MAY BE $8-9K FOR A NEW MOTOR. *BESIDES THIS EXPENSE IS TO KNOW THIS ENGINE WILL HYDRO LOCK WITH ALL THE COOLANT IN IT AND CANNOT BE EASILY DRIVEN TO A SAFE LOCATION SEEMS VERY VERY DANGEROUS TO ME. IF THE EXIT WERE NOT LESS THAN A 1/2 MILE AWAY I WOULD HAVE BEEN STUCK. NO ONE WANTS TO BE ON A DARK FREEWAY FOR 1-2 HOURS WAITING FOR A TOW TRUCK ON A COLD FRIDAY NIGHT. ALL IS TAKES IS ONE PERSON FROM BEHIND TO SLIP OFF INTO THE EMERGENCY LANE AND THEN IT'S ALL OVER.*

- **April 7, 2017 – 2010 Ford Flex**

    VEHICLE WAS TURNING OFF OF A STATE HIGHWAY INTO A SCHOOL ENTRANCE. WITHOUT WARNING (NO WARNING LIGHTS ON DASH) ENGINE STOPPED RUNNING. DUE TO ENGINE SHUT DOWN ALL AUXILIARY SYSTEMS LOST POWER. VEHICLE WAS MAKING A LEFT TURN INTO A SCHOOL ENTRANCE WHEN ENGINE TURNED OFF. *IN THE MIDDLE OF THE TURN THE LOSS OF POWER STEERING AND POWER BRAKES MADE NEGOTIATING THE TURN UNSAFE. THE OPERATOR WAS UNABLE TO KEEP THE VEHICLE ON THE PAVED ENTRANCE AND ENDED UP OFF THE SHOULD AND INTO THE GRASS. FORTUNATELY THERE WERE NO PEDESTRIANS OR OBSTACLES. FAILURE COULD CAUSE A SAFETY ISSUE AT HIGHWAY SPEED DUE TO POTENTIAL FOR REAR ENDING DUE TO LOSS OF POWER. . . .* THE VEHICLE REPAIR WAS JUST COMPLETED YESTERDAY AND *I STILL FEEL UNSAFE AND UNCOMFORTABLE KNOWING THE SAME POTENTIAL FOR ENGINE FAILURE EXISTS.*

- **February 14, 2018 – 2010 Ford Taurus**

    ON SUNDAY, 2/11/2018, I WAS DRIVING EAST I-26 IN COLUMBIA, SC HEADING TO WORSHIP SERVICES AND

WITHOUT WARNING, MY CAR SUDDENLY SHUTDOWN CAUSING ME TO LOSE MY STEERING ABILITY. I MANAGED TO GUIDE THE CAR OUT OF THE 60 MPH TRAFFIC AND CAME TO A STOP. . . . ***THIS FAILURE ALMOST CAUSED ME TO HAVE A MAJOR ACCIDENT ON A MAJOR INTERSTATE HIGHWAY. I THINK FORD SHOULD RECALL THESE ENGINES. MANY AUTO EXPERTS HAVE DISCOVERED THIS ISSUE WITH THE ENGINE. LOSS OF LIFE IS POSSIBLY WITH THIS DANGEROUS ENGINE MALFUNCTION AND AN ESTIMATED $7,300.00 ENGINE REPLACEMENT BILL. PLEASE TAKE ACTION ASAP TO AVOID DEATH AND INJURY TO FORD OWNERS. A RECALL COULD SAVE LIVES.***

- **May 23, 2018 – 2010 Ford Taurus**

  WHILE TRAVELING THROUGH A RED LIGHT ON A STATE ROUTE, I BEGAN TO ACCELERATE. ALL DASH LIGHTS CAME ON. ENGINE SOUNDED CHOKED. VEHICLE THEN WOULD NOT ACCELERATE TRAVELING UP HILL. FORCING ME TO PULL OVER IMMEDIATELY. AFTER BEING TOWED TO A FORD DEALERSHIP FOR REPAIRS, WAS ADVISED THE ENGINE NEEDED REPLACED. DEALERSHIP SERVICE STATED THE WATER PUMP FAILED RELEASING COOLANT INTO THE ENGINE, DAMAGING THE ENGINE PERMANENTLY. ***TRAVELING THIS ROADWAY IS USUALLY A SEMI ROUTE TO A MAJOR HIGHWAY AND FACTORIES. SEMIS DO NOT SLOW DOWN OR STOP AS QUICKLY AS A CAR AND COULD HAVE CAUSED A FATAL ACCIDENT DO TO THE ABRUPT PULL OVER THAT WAS NECESSARY DUE TO THE MALFUNCTION.***

- **July 25, 2018 – 2010 Ford Edge**

  I AM VERY DISAPPOINTED AND UNSAFE WITH MY FORD EDGE, FOR THE LAST FEW WEEKS IT HAS BEEN SHUTTING OFF WHEN THE CAR COMES TO A STOP OR IN IDLE. THERE IS NO CODES OR ANY WARNING SIGNS THAT COMES UP. THE CAR JUST LOSSES POWER AND SHITS OFF ON ITS OWN. . . . ***TODAY I WAS ON MY WAY HOME ON THE HIGHWAY I COME TO SLOW DOWN GETTING OFF ON MY EXIT AND THE CAR JUST SHUTS OFF AND THE STEERING WHEEL GETS TIGHT AND I CAN'T MOVE OR TURN IT . THERE WAS CARS NEXT TO ME AND BEHIND ME AND IN FRONT I COULD OF***

*GOT HURT OR PUT OTHERS IN DANGER. THIS IS NOT SAFE FOR FORD TO HAVE VECHILES OUT ON THE ROAD LIKE THIS WITH NOT SOURCE OF HOW TO FIX IT OR ANY WARNING LIGHT.*

- **October 21, 2018 – 2011 Ford Flex**

  WATER PUMP, ENGINE. ALL OF A SUDDEN OUT OF THE BLUE WITH NO INDICATIONS, WARNING, LEAKS, STALLS, ROUGH DRIVING, NO STARTS, LIGHTS OR SMELLS; SENT TO START CAR AND IT WAS MAKING A METAL GRINDING/RATTLING SOUND AND WOULD NOT START. I HAD IT TOWED OVER TO THE FORD DEALER AND 2 DAYS LATER THEY LOOKED AT IT. THEY STATED THE WATER PUMP CATASTROPHICALLY FAILED, LEAKED INTO THE OIL PAN, OVERFILLED THE OIL PAN AND CAUSE COOLANT/WATER TO BE CIRCULATED THROUGH ENGINE CAUSING NO COMPRESSION AND SEIZING THE ENGINE . . . *I AM JUST GLAD THIS DID NOT HAPPEN TO MY WIFE ON HER TRIP TO MICHIGAN AT NIGHT ON THE WEEKEND WITH KIDS IN THE CAR. IT MUST BE AN ISSUE IF I CAN FIND CLASS ACTION LAWSUITS ON THEI EXACT ISSUE. HOLD FORD RESPONSIBLE, THEY ARE GOING TO KILL SOMEONE OR THEIR FAMILIES.*

- **November 29, 2018 – 2011 Ford Explorer**

  WE WERE TRAVELING I-26 FROM SC BACK INTO NC AFTER THANKSGIVING. MY CAR DINGED AND SAID COOLANT TEMP WAS TOO HIGH. THANKFULLY I WAS RIGHT AT A REST AREA AND IMMEDIATELY PULLED IN AND TURNED OFF THE CAR . . . *I AM THANKFUL I WAS IN A POSITION TO PULL OVER IMMEDIATELY, BECAUSE IF THE ENGINE HAD GONE OUT ON THE BUSY INTERSTATE, THAT COULD HAVE BEEN A TERRIBLE CRASH. IF A WATER PUMP CAN CAUSE ENGINE FAILURE, THAT IS NOT A CAR I WANT TO BE IN WITH MY CHILDREN. DANGEROUS NOT ONLY TO US, BUT TO OTHERS TRAVELING NEAR US. FORD NEEDS TO RETHINK THIS DESIGN. NOT ONLY IS IT COSTLY TO REPAIR, BUT MORE IMPORTANTLY IT CAN BE VERY DANGEROUS.*

- **November 30, 2018 – 2011 Ford Fusion**

   MY VEHICLE WAS MOVING IN A PARKING LOT WHEN THE ENGINE SUDDENLY BEGAN TO MISFIRE AND STALLED. THE FORD DEALERSHIP TOLD ME THE ENGINE SUFFERED A CATASTROPHIC FAILURE. THIS HAPPENED WITHOUT WARNING. . . . *IF THIS PROBLEM WOULD OCCUR AT HIGHWAY SPEEDS NO POWER STEERING OR BRAKES WOULD BE OPERABLE, POSSIBLY RESULTING IN ACCIDENTS. THIS IS AN UNACCEPTABLE SITUATION!*

- **January 15, 2019 – 2013 Ford Edge**

   ON WEDNESDAY, JANUARY 9, 2019, MY 2013 FORD EDGE REPORTED AN "OVERHEATED COOLANT" MESSAGE AND WITHIN 2 SECONDS THE ENGINE LIGHT APPEARED, *THE CAR IMMEDIATELY LOST THE ABILITY TO ACCELERATE AND BEGAN DECELERATING WHILE DRIVING AT 45 MPH ON A BUSY ROAD DURING NIGHT TIME RUSH HOUR TRAFFIC. THIS ENDANGERED MY SAFETY AND THE SAFETY OF OTHER MOTORISTS THAT HAD TO QUICKLY AVOID HITTING MY CAR. BOTTOM LINE HERE IS THAT THIS FLAWED DESIGNED IS A SAFETY ISSUE AND FORD SHOULD RECALL THE FORD EDGE TO FIX THIS WATER PUMP PROBLEM BEFORE SOMEONE IS SERIOUSLY INJURED OR DIES.*

100. Because the majority of complaints are made directly to Ford authorized dealerships, it is reasonable to infer Ford has received, either directly from customers or through its exclusive network of dealers, several times the number of complaints identified above.

101.   Notably, as detailed in the below table, during the same time period NHTSA received few, if any, complaints about water pump failure in other Ford and Mazda vehicles which do not utilize an internal water pump[10]:

| | NHTSA WATER PUMP COMPLAINTS |
|---|---|
| CLASS VEHICLES AND MAZDA VEHICLES WITH CYCLONE ENGINE | |
| EDGE | 53 |
| EXPLORER | 32 |
| FLEX | 17 |
| FUSION 2010-2012 | 9 |
| TAURUS | 25 |
| MKT | 3 |
| MKX | 7 |
| MKZ | 4 |
| CX-6 | 28 |
| MAZDA6 | 1 |
| **TOTAL** | **179** |
| NON-CLASS VEHICLES | |
| C-MAX HYBRID | 1 |
| CROWN VICTORIA | 1 |
| E-150 | 1 |

[10] The Ford Escape is not included in the above table since it was recalled due to a water pump defect.

| | |
|---|---|
| F-150 | 11 |
| F-250 | 2 |
| F-250 SD | 2 |
| F-450 SD | 1 |
| F-550 SD | 1 |
| FIESTA | 6 |
| FOCUS | 3 |
| FREESTYLE | 3 |
| FUSION | 16 |
| FUSION HYBRID | 2 |
| MUSTANG | 7 |
| TRANSIT | 1 |
| TRANSIT CONNECT | 1 |
| RANGER | 0 |
| EXPEDITION | 0 |
| ZEPHYR | 1 |
| MARINER | 1 |
| MARINER HYBRID | 3 |
| MILAN | 1 |
| MKS | 3 |
| GRAND MARQUIS | 0 |
| MONTEGO | 0 |
| MONTEREY | 0 |
| MOUNTAINEER | 0 |

| | |
|---|---|
| NAVIGATOR | 0 |
| **TOTAL** | **69** |

102.   When the NHTSA complaints relating to the Ford vehicles are normalized to account for vehicle age and sales volume, the complaint rate for nearly every model year of the Class Vehicles is many times higher than the non-Class vehicles (those without the Cyclone Engine and chain driven internal water pump) and under basic manufacturing principles would have alerted Ford to the presence of a Defect, as demonstrated in the below table and chart:

| | CLASS | NON-Class |
|---|---|---|
| **ModelYear** | **MillionVehExposedYears** | **MillionVehExposedYears** |
| **2007** | **2.558** | **0.281** |
| **2008** | **6.326** | **0.223** |
| **2009** | **0.000** | **0.075** |
| **2010** | **7.913** | **0.404** |
| **2011** | **7.330** | **0.453** |
| **2012** | **1.100** | **1.352** |
| **2013** | **6.148** | **1.513** |
| **2014** | **1.525** | **0.990** |
| **2015** | **3.012** | **0.339** |
| **2016** | **1.583** | **0.286** |
| **2017** | **0.000** | **0.000** |
| **2018** | **1.083** | **0.000** |



Worksheet: FordNHTSAComplaints

103.   The following table and chart show how much higher the complaint rates were for the Class Vehicles than they were for the non-Class Vehicles when the complaints are normalized to account only for sales volumes:

| Class Models | Complaints | Volume | Rate per Million |
|---|---|---|---|
| Edge | 53 | 1,471,185 | 36.03 |
| Explorer 2011-2018 | 32 | 1,567,564 | 20.41 |
| Taurus | 25 | 621,996 | 40.19 |
| Flex | 17 | 277,763 | 61.20 |
| Non-Class Models | | | |
| E-Series | 1 | 1,161,500 | 0.86 |
| F-Series | 17 | 8,302,809 | 2.05 |

| | | | |
|---|---|---|---|
| Focus | 3 | 2,220,730 | 1.35 |
| E, F, Focus | 21 | 11,685,039 | 1.80 |
| Expedition | 0 | 586,725 | 0.00 |
| Navigator | 0 | 141,370 | 0.00 |



Worksheet: CperMillion

104.   Even more striking is how many times worse the complaint rates were

for specific Class Vehicles when compared to specific non-Class Vehicles:

| Class Models | Times Worse than E-Series, F-Series, Focus | Times Worse than Focus | Times Worse than E-Series |
|---|---|---|---|
| Edge | 20.05 | 26.67 | 41.84 |
| Explorer 2011-2018 | 11.36 | 15.11 | 23.71 |
| Taurus | 22.36 | 29.75 | 46.68 |
| Flex | 34.06 | 45.31 | 71.09 |

105.   As demonstrated by the above table, the Ford complaint rate for the Ford Edge is 41.84 times worse than the Ford E-Series, 26.67 times worse than the Ford Focus, and 20.05 times worse than the combined rates of the E-Series, F-Series, and Focus.

106.   Moreover, the NHTSA complaint rates are even more striking when the volume of NHTSA complaints in Class Vehicles is compared to the dearth of NHTSA complaints about water pumps in vehicles sold by Nissan and Subaru which also utilize an internal water pump, as reflected in the table below:

| Model Year | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NISSAN | | | | | | | | | | | | | |
| ALTIMA | 1 | 1 | | | | 1 | | | | | | | 3 |
| FRONTIER | 1 | | | | | | | | | | | | 1 |
| PATHFINDER | 1 | | | | | | | | | | | | 1 |
| Maxima | | | | | | | | | | | | | 0 |
| 350Z | | | | | | | | | | | | | 0 |
| Murano | | | | | | | | | | | | | 0 |
| Quest | | | | | | | | | | | | | 0 |
| INFINITI | | | | | | | | | | | | | |
| QX4 | | | | | | | | | | | | | 0 |
| I35 | | | | | | | | | | | | | 0 |
| G35 | | | | | | | | | | | | | 0 |
| FX35 | | | | | | | | | | | | | 0 |
| M35 | | | | | | | | | | | | | 0 |
| JX35 | | | | | | | | | | | | | 0 |
| QX60 | | | | | | | | | | | | | 0 |
| Q50 | | | | | | | | | | | | | 0 |
| Q60 | | | | | | | | | | | | | 0 |
| QX50 | | | | | | | | | | | | | 0 |
| SUBARU | | | | | | | | | | | | | |
| OUTBACK | | | | 1 | 3 | 1 | | | | | | | 5 |
| Legacy | | | | | | | | | | | | | 0 |
| Tribeca | | | | | | | | | | | | | 0 |

107.   It is also industry practice for automakers to compare complaint rates to competitors' vehicles. As such, Ford would have known that not only were the Class Vehicles experiencing higher water pump failure and complaint rates than other Ford vehicles, but also that the Class Vehicles were experiencing higher water

pump failure and complaint rates than competitors which also sell vehicles with internal water pumps.

108.   Furthermore, due to the fact that they worked in conjunction on the design, engineering, and developing of the Cyclone Engine, Defendant and Mazda also exchanged reports from dealers, consumers, and NHTSA complaints regarding the Water Pump Defect in Ford and Mazda vehicles incorporating the Cyclone Engine with Mazda. As a result, Defendant also would also have been aware of NHTSA complaints concerning Mazda vehicles with the same Water Pump Defect, a small sample of which are included below:

- **April 30, 2016 – 2009 Mazda CX-9**

  SUV WOULD GO OFF IN THE MIDDLE OF THE ROAD OR HIGHWAY THEN TRAVELING A HIGH SPEED. TOOK IT TO DEALER, THEY SAY THAT THEY FOUND OIL & WATER MIX IN THE ENGINE DUE TO WATER PUMP FAILURE, MULTIPLE SYMPTOMS WOULD OCCUR AS DUE TO THIS CONDITION. THIS ISSUE IS VERY SERIES, FIRST YOU GET NO INDICATION OF THE PROBLEM, NOT SURE WHY THE WATER PUMP FAILURE CAUSES WATER TO ENTER THE MOTOR AND MIX WITH OIL, IT MUST BE A MAZDA DESIGN PROBLEM, WHICH THEY SEEM TO KNOW ABOUT AND NEVER ISSUED A RECAL TO GET ALL THE CAR FIXED. IF YOU ARE DRIVING WITH YOUR FAILURE AT 50 MPE IN A HIGHWAY THE CAR WILL JUST GO OFF AND YOU CAN GET IMPACTED AT THE REAR WITH VERY HORRIBLE CONSEQUENCES. WILL MAZDA ISSUE A RECAL FOR SUCH A SERIES ISSUE?

- **October 25, 2017 – 2010 Mazda CX-9**

  I HAVE A MAZDA CX9 2010, I GOT NO INDICATION THAT THERE WAS A PROBLEM WITH MY WATER PUMP. THE CARE DID NOT OVER HEAT, IT DID NOT STALL AND I WAS NO

STEAM COMING FROM THE CAR. I DROVE MY VEHICLE TO THE OTHER SIDE OF THE WATER MORE THAN 20 MILES FROM MY HOME, SO THAT I COULD GO TO WORK. IF IT WERE NOT FOR THE PHARMACIST AT MY JOB I WOULD HAVE GOTTEN IN MY CAR AND DROVE OFF. HE NOTICE A PUDDLE UNDER MY CAR AND ASKED ME TO COME OUTSIDE SO HE COULD INVESTIGATE THE SITUATION FURTHER. HE SAW WHERE THE FLUID WAS COMING FROM AND WENT UNDER THE CAR TO TOUCH THE FLUID AND FOUND THAT IT WAS MY ANTI-FREEZE. IF I KNEW I HAD A PROBLEM I WOULD HAVE NEVER DRIVEN THE CAR THAT FAR FROM HOME. I GOT A QUOTE FROM THE DEALER THAT IT WOULD COST ME $2050 TO REPAIR THE WATER PUMP. AS I DID RESEARCH, I FOUND THAT THIS IS SOMETHING THAT GOES ON WITH THESE VEHICLES AND THERE IS NO REAL WAY AROUND HAVING TO PAY THE DEALER THAT TYPE OF MONEY TO REPAIR THEPROBLEM BECAUSE OF THE WAY THE PUMP IS PLACED INSIDE OF THE ENGINE CAVITY. . . . I THANK GOD THAT I WAS NOT ON THE HIGHWAY. I COULD HAVE DIED THAT DAY.

- **May 17, 2019 – 2010 Mazda CX-9**

THE ENGINE OVERHEATED WHILE DRIVING ON A HIGHWAY AT HIGH SPEED AND FAILED WITHOUT WARNING. AFTER INVESTIGATION IT WAS FOUND THAT WATER PUMP MALFUNCTIONED FORCING COOLANT INTO THE ENGINE. IT IS NOT COMPLETELY INOPERABLE AND THE CAR HAS ONLY AROUND 80,000 MILES ON IT. THIS IS A MAJOR SAFETY ISSUE! THE CAR WAS SERVICED AND OIL CHANGED JUST A FEW MONTHS BEFORE THIS HAPPENED. THIS IS A MAJOR DESIGN FLAW ON MAZDA'S PART, WHICH THEY SEEM TO KNOW ABOUT AND NEVER ISSUED A RECALL TO GET ALL THE CARS FIXED. REPLACING AN ENGINE IS NOT SOMETHING MOST FAMILIES HAVE THE BUDGET FOR OR EVEN THINK ABOUT WHEN THE CAR IS LESS THAN 10 YEARS OLD. THERE WERE NO WARNING SIGNS OF WATER PUMP FAILURE. MAZDA NEEDS TO WARN CX-9 OWNERS WITH TSB OR RECALL THE WATER PUMP. THE WATER PUMP IS NOT BURIED INSIDE THE ENGINE AND CANNOT BE VISUALLY INSPECTED. HAVING A VEHICLE SHUT OFF

62

ABRUPTLY WHEN TRAVELING AT HIGH SPEEDS IS A
SERIOUS RISK FOR BOTH DRIVER, VEHICLE OCCUPANTS
AND SURROUNDING MOTORISTS. I HOPE NHTSA TAKES
THIS COMPLAINT SERIOUSLY AND TAKES ACTION BEFORE
A SERIOUS OR FATAL INJURY OCCURS.

109. Moreover, as is the case with the NHTSA complaints pertaining to the

Class Vehicles, several of the NHTSA complaints pertaining to the Mazda vehicles

detailed grave safety concerns, including the following:

- **December 27, 2017 – 2012 Mazda CX-9**

   IF WATER PUMP FAILS THE ENGINE WILL SHUT DOWN
   WITHOUT WARNING OR ANY TYPE OF CHECK ENGINE
   LIGHT OR ALERT. COOLANT WILL FLOOD CRANKCASE
   IMMEDIATELY AND RUIN THE ENGINE. ***THIS OCCURRED
   WHILE DRIVING CREATING A SERIOUS SAFETY ISSUE
   POTENTIALLY CAUSING A COLLISION.***

- **January 13, 2018 – 2012 Mazda CX-9**

   WHILE DRIVING MY VEHICLE ON THE HIGHWAY MY CAR
   WOULD NOT ACCELERATE WHEN I PRESSED ON THE GAS.
   MY RPM'S WENT UP TO 4 AND WOULD DROP DOWN WHEN I
   LET OFF THE GAS. WITHIN MINUTES MY STEERING WHEEL
   LOCKED UP AND THE CAR BASICALLY SHUT DOWN. I HAD
   TO TRY AND DRIFT TO THE SHOULDER IN HIGH SPEED
   TRAFFIC. WHEN I GOT TO THE SHOULDER THE CAR
   STARTED SMOKING. I HAD THE CAR TOWED TO MAZDA
   DEALERSHIP. THEY TOLD ME MY WATER PUMP WENT AND
   LEAKED FLUID THROUGHOUT THE ENGINE, RESULTING IN
   ME NEEDING A NEW $8,000 ENGINE. THEY TOLD ME THAT
   MAZDA DESIGNED THE CX9 WHERE THE WATER PUMP IS IN
   THE ENGINE BLOCK BEHIND THE TIMING BELT AND IT IS
   NOT SOMETHING THEY CAN EASILY INSPECT WHEN I BRING
   MY CAR IN FOR SERVICE. SO WHEN A WATER PUMP GOES
   ON THESE MAZDA CX-9'S IT RESULTS IN THE CONSUMER
   NEEDING A WHOLE NEW ENGINE. THEY ALSO STATED
   THAT THERE ARE NO INDICATORS THAT WILL NOTIFY YOU
   IF THERE IS A PROBLEM WITH THE WATER PUMP TO AVOID

63

THIS FROM HAPPENING. ***THE SAFETY ISSUE IS THAT MY CAR WAS ON THE HIGHWAY AT THE TIME THIS OCCURRED WITH VEHICLES GOING AT HIGH SPEEDS. MY CAR BASICALLY SLOWED DOWN SIGNIFICANTLY AND EVENTUALLY STOPPED AND I COULD NOT TURN THE STEERING WHEEL TO BETTER ASSIST ME GETTING OUT OF THE WAY OF THE HIGH SPEED TRAFFIC.***

- **July 18, 2018 – 2010 Mazda CX-9**

  WHILE TRAVELING 65MPH ON HIGHWAY WITH FAMILY THE VEHICLE SHUT DOWN, ENGINE LIGHT APPEARED AND WE NEARLY WERE STRUCK BY ANOTHER VEHICLE WHEN PULLING OVER. CX-9 WAS TOWED 75 MILES TO MECHANIC WHO INFORMED US COOLANT ENTERED THE ENGINE FROM FAILED WATER PUMP AND ENGINE NEEDS REPLACEMENT ($4000). MAZDA SERVICE MANAGER CONFIRMED THIS IS NOT UNCOMMON AND CONFIRMED ENGINE WILL NEED TO BE REPLACED. WHEN RESEARCHING CX-9 WATER PUMP FAILURE ONLINE I FOUND MANY DISTURBING TESTIMONIALS OF OTHER CX-9 OWNERS WITH SIMILAR EXPERIENCES. THERE WERE NO WARNING SIGNS OF WATER PUMP FAILURE. MAZDA NEEDS TO WARN CX-9 OWNERS WITH TSB OR RECALL THE WATER PUMP. THE WATER PUMP IS NOT BURIED INSIDE THE ENGINE AND CANNOT BE VISUALLY INSPECTED. ***HAVING A VEHICLE SHUT OFF ABRUPTLY WHEN TRAVELING AT HIGH SPEEDS IS A SERIOUS RISK FOR BOTH DRIVER, VEHICLE OCCUPANTS AND SURROUNDING MOTORISTS. I HOPE NHTSA TAKES THIS COMPLAINT SERIOUSLY AND TAKES ACTION BEFORE A SERIOUS OR FATAL INJURY OCCURS.***

    4.    **Defendant Knew About the Water Pump Defect Through, and as Reflected by, Online Complaints**

110.    Numerous purchasers and lessees of Class Vehicles have also posted about their experiences with the Water Pump Defect in the Class Vehicles on internet forums created for the discussion of particular vehicle models. Among others, these

64

forums include: FordFlex.net, FordTaurus.net and ExplorerForum.com. These complaints, detailing both the failures and the responses of Defendant and Ford authorized dealerships, began at least by July 2008. The following excerpts are examples of such online complaints concerning the Water Pump Defect, and customers' contact with Ford about the Defect, posted to online forums such as FordEdgeForum.com, FordFlex.net, ExplorerForum.com, and FordTaurus.net:

- **July 19, 2008: 2007 Ford Edge:**

  2007 SEL AWD. Been through the seal problems. After 2/3 times got that fixed. Wife gets to works Tuesday and notices a lot of liquid running from front left, coating wheel well, running back through frame. Has to be a couple quarts. Calls me and it is brown and slippery. I think seal leak. Check oil. ok. Check transmission. Ok. Visually check brake fluid, other radiator hoses etc. All appear ok. I go over at end of day when she starts it and only a drip or two on ground of new parking space. Dealer says bring right in. We do next day and again only about a half dollar sized spot on driveway. Same brown. They can't find for first day. Do dye test, and call and tell us water pump. Also that it is 13 hours labor because of where it is located. And will take 4-5 days to get part and fix. Warranty, so for now cost is not an issue, but at this rate I can't see keeping at end of lease.

- **September 2, 2013: 2007 Lincoln MKX**

  I just bought a used a 2007 lincoln MKX less than a month ago. I was driving home and it started overheating so I pulled over and it was leaking coolant. Got it towed home and looked at it the next day and all the coolant had drained out. I put water back into the radiator and right away the water started leaking out on the front passengers side. I turned the engine on and I can hear the water pump whining like the bearing is going bad. My question is if it was a bad water pump that was leaking would water be able to leak out of the front engine cover? Or is it more likely the head gasket blew and it has an external coolant leak. After running it for a little bit water started getting into the oil and the water

that was leaking out had oil in it too. I'm just hoping its just the water pump and not also a bad head gasket.

- **February 14, 2014: Ford Edge Forum**

   I did call the ford dealer today jan 1 2014 and they confirmed that a leaking internal waterpump on these engines(3.5L v6/duratec 35) can leak coolant into the water...seems like a design flaw that should be recalled.

- **March 24, 2014: Ford Flex**

   Thursday I go out to the garage a notice a ton of coolant all over the ground . . . It looks like it is coming from the water pump . . . The dealership told me to call Ford Customer Care for assistance, that they might be able to help me out in some way. WOW, that was a rude call, told me I had no coverage and asked why I bothered to call them.

- **March 25, 2014: 2011 Ford Explorer**

   I hate being the guy that joins only to have his first post be about needing help, but I've been lurking here for the better part of a year and now have a depressing reason to reach out for assistance.

   This is long, so the summary is 1k miles over warranty, water pump failed without any check engine light or rise in engine temperature, this lead to complete engine failure, dealer wants $7300 to replace engine and Ford won't help . . .

   On March 15, 2015, I loaded up the family (wife, 6 year old, 3 year old, and 6 month old) in Phoenix, AZ for a quick four day vacation in California during Spring Break. Somewhere around Desert Center, CA, aka the middle of the desert, I started hearing a faint rattle under the hood when the tranny downshifted in order to maintain cruise control speed . . . The problem continued to worsen over the next 10 minutes until the engine completely lost power . . . I called AAA and after being stranded in the desert for three hours, we finally had the car towed to Fiesta Ford in Indio, CA. Anyone ever been without A/C in the desert for three hours with a 6 month old baby? Not fun . . . The car had 61k+ miles on it at the time, a mere 1k over the 60k powertrain warranty (but still under the 5 year), when Fiesta asked if I wanted to spend $2300 to break the engine down in order to see what happened and to see if Ford would warranty it. I felt pretty stuck at this point so I said sure. I'm 300

66

miles from home, no car, vacation ruined, and I need to safely get my family home somehow.

After spending $350 in renting a minivan to drive home, I hear back from Fiesta. The results were failed water pump which lead to complete engine failure and it was going to cost $7300 to put a new engine in. When the regional Ford rep reviewed the case, they denied the claim because 1) I'm 1k over the warranty, 2) I'm not the original owner and 3) I don't have enough Ford Loyalty . . . The dealer told me coolant entered the engine when the water pump failed.

The mystery behind it is what gets me. No rise in temperature, no notification when things were not right, no steam coming out of the hood, no white smoke out the exhaust, just a slow power loss over 10 minutes with some weird rattle coming from the front of the car. Then when the car is finally stopped, I get a low engine oil light and a check engine light P0017. The car wasn't dripping any fluid when I was stopped. You can kind of see from the picture the area is totally dry.

- ### December 23, 2015: 2010 Ford Flex

  Catastrophic Water pump Failure Lots of Coolant in Oil, $7,000 repair

  I own a NA 2010 Ford Flex with about 151k on the clock. Posted some info in another post but decided this needs it own thread. My Flex sudden stopped last week, had it towed home to see what issue could be. After researching and most helpful info on htis site determined was water pump. Had Flex towed to local dealer to have diagnosed. Ford dealer started work on Monday and determined yes was water pump. Goto today Wednesday and got some picks from dealer showing was catastrophic failure. Went to Ford this afternoon and took some pix. Water pump was nearly completely destroyed.

- ### September 23, 2015: 2011 Taurus

  2011 SEL with 115k on the clock and my water pump failed. No warning, no dripping from the weep holes, coolant temperature light came on and gauge pegged. Found reserve bottle empty, (just did an oil change and checked fluids. Coolant was ok.) Checked the dip stick, approx. 3 qt. over full and milky in color. No noise or any pre-indication that this memorable event was going to happen.

As you are aware, the water pump is timing chain driven and located behind the timing cover. So if there is a failure, the coolant goes into the crankcase and mixes with the oil. UGH!

Called several of the local dealers today, two weeks before they could get it done. Parts and labor estimate from everybody I called, around $1,400. Took it to a local repair guy who completed the repair in a few days. What we found was that the pump bearing failed and allowed the coolant to dump into the crankcase. Luckily, I shut the engine off in the nick of time, and after two oil changes the engine did not suffer a catastrophic failure.

- **January 23, 2016: 2010 Ford Edge Limited**

  Hi. I am new to the Forum, but have been doing extensive searches on this problem. I think we are just seeing the tip of the iceberg. I am finding other drivers who have experienced catastrophic engine failure due to water pump leak/fail on Ford products due to the design of this engine.

  If you have coolant in the engine oil, your engine has been compromised!

  This Duratec 35 engine/water pump system is on the 2007-2014 Ford Edge, 2007-2010 Lincoln MKX, 2007-2014 Lincoln MKZ, 2008-2014 Ford Taurus, 2008-2009 Ford Taurus X, 2008-2009 Mercury Sable, 2009-2004 Ford Flex, 2012-2012 Ford Fusion Sport, and 2011-2014 Ford Explorer.

  To see the true scope of the problem, you need to look at ALL of these forums. I found this one by searching only on 'Duratech 35 problems' without specifying a model.

  I am a young man, limited budget, first child on the way, from a Ford loving family. Bought my 2010 Ford Edge Limited for $15000, just 10 months ago. Certified pre-owned from the same well respected Ford Dealership where the original owner had purchased it and just recently traded it in.

  I have just experienced what can only be called a catastrophic failure at 88000 miles due to water pump leaked and contaminated the engine oil with coolant.... $2300 quoted to replace water pump only, but told

68

really need to replace engine too as bearings may be damaged ... total $7000 . . .

The rest of the story can be found by searching the internet. The internal water pump (what were they thinking?) leaked coolant into the engine oil. Almost simultaneously, the sensor recognized a problem in the engine due to contaminated oil/bearings coming apart/oil pressure dropping just as coolant had dropped to a level that caused temperature to rise.

NOTE: The engine never seized. It sounds fine. BUT the engine oil is contaminated with lubricant. I could probably change the oil and drive another ?? how many miles ?? before the bearings finally go due to the damage caused by the contamination! I think this is what happened to you.

I think Ford is praying that these incidents remain isolated and unpublished. You won't see a recall. I wonder how many of these have happened under warranty, so we don't hear about them?

But we ALL know that water pumps do not have the same life span as the engine. Now we also know that these vehicles have a design that has the potential to take out the motor with it when it fails... so what does it matter if it fails within warranty OR at anytime after 60,000 miles? Since when is this acceptable?

- **May 18, 2016: 2013 Ford Taurus**

  2013 Ford Taurus SEL 3.5 V6--completely loaded sans the ECO boost. Original owner, bought new in August 2012. Still have one year left of $500 a month payments.

  Water pump failure at 88,000 miles. No warranty. Car has always been dealer serviced as per owner's manual. Luckily, our's started leaking out the weep hole behind the alternator and not internally into the engine. Pulled in for gas and noticed steam coming from engine compartment. Closer examination, I found the leak and took it back home.

  Estimate for repair: $3500. They recommend all the timing components also be replaced at this time as the chains and tensioners must be removed. ESTIMATED TIME FOR REPAIR: 2-3 MONTHS!!!!!!!

69

Ford cannot keep up with the demand on the water pumps and there is a National back order. They are not available aftermarket. If you wish to plunk down $8500 for a new engine, they can get you up in 2 weeks.

That is a load of crap. If anyone wants to start a class-action lawsuit, or if anyone knows of one already, I am willing and able to join.

I will never, ever buy another Ford.

Had to go buy another car. Toyota this time.

- **November 30, 2016: 2013 Ford Taurus**

  I have 2013 Ford Taurus SEL, 3.5L engine. My water pump failed at 95k miles! My wife was driving on the freeway when she noticed the Engine temp coolant go to High and she stopped and called me, luckily. I noticed leaking under the engine. I was gonna tackle the job myself but I noticed that the water pump is not outside, I looked at the forums and found that it is behind a cover plate and run off the timing chain, damn difficult job for me. So, I took it to the dealer to evaluate and repair, they told me it was a water pump failure and charged me over $1600 ! Looking at these forums, it seems that is not uncommon for the 3.5l engine. I hope ford does the right thing and re-imburse me or give me $1600 credit. Hell I've owned 3 fords in 5 yrs.

- **November 30, 2016: 2011 Ford Taurus**

  I have a 2011 Ford Taurus Limited 3.5L that I have owned since 2012. I purchased it used with 20k miles and have been diligent with maintenance since I purchased it. 2 days ago, as I was driving home from a weekend trip. My temperature sensor suddenly came on and the temperature gauge barried itself. I slowed down and coast the car into a gas station about 1-2 miles down the road . . . The owner of the gas station came out and took a look and said he thought it was the water pump . . . In the morning I went to check on the vehicle and that's when we discovered the coolant in the engine. I called Ford and their head mechanic told me that this is a common problem with late model Fords and they are designed in a manner that the coolant will pour into the engine if the water pump fails and will destroy the engine.

  At this point I have to have it towed 180 miles to the Ford dealership where I live to find out if I need a new engine or will be able to just

70

replace the water pump and flush the engine. My guess...I'll need a new engine!

Just wanted to share my story as one of obviously many others due to an extremely poor mechanical design by Ford. My family has always owned fords but now, knowing that this is how they are building cars...this will be the last!! I will never buy a Ford product again!

- **January 10, 2018: 2010 Ford Flex SEL**

  Truly grateful to have found this thread. I don't usually post to boards, but wanted to share my experience in the hopes that it might help others, as this forum was a help to me.

  Add my 2010 Ford Flex SEL to the list of those who have had water pump failure (after having PTU failure last summer). Vehicle has 90,000 miles . . .

  Mad at Ford and knowing it was going to cost a ton to fix, I took it to a reputable independent shop. Their response? "We can't fix this. 10+ hours of labor and need special tools. And even if we could, we wouldn't recommend it. Once engine has been contaminated by coolant it will never be right again. Take it to a dealer if you want to try and fix it". Called my dealership and they confirmed that this is something they have seen many times . . . I have to question the intelligence of how certain components in this vehicle were designed. What's next?

  **5.    Defendant's Knowledge of the Water Pump Defect Is Demonstrated by the Development History of the Internal Water Pump**

111.   Ford's pre-sale knowledge of the Water Pump Defect is further demonstrated by the development history of the internal water pump, and Ford's decision to use a different design in other vehicles.

112.   Specifically, Ford designed the Cyclone Engine with an internal water pump to minimize the size of the engine in order for it to fit in the same engine compartment as its predecessor, despite potential risks associated with this design.

71

113.    In order to save space, the design included placement of the water pump above the crankshaft in the center of the engine, knowing any coolant leak would mix with engine parts and oil.

114.    The design decision to use an internal water pump in the Ford Cyclone Engine was to minimize the size of the engine when used in front-wheel/all-wheel drive configuration. (*See* Bill Visnic, *Ford Duratec 35 Thrives on Simplicity*, WARDSAUTO (Feb. 21, 2007), https://www.wardsauto.com/node/23175). Before deciding to use this design, Ford engineers would have understood the potential risk associated with this new design.

115.    Notably, when the Cyclone Engine (3.5L or 3.7L) is used in rear-wheel drive configuration (where space minimization is not a design constraint), the water pump is mounted external to the engine block (*See*, Mustang and F-150). As such, when given a design choice not constrained by size minimization, Ford engineers knew to choose a less dangerous, external water pump over an internal water pump in the Ford Cyclone Engine when used in rear-wheel drive configuration.

116.    Ford also attempted to fix its flawed water pump multiple times, which further shows that Ford engineers were aware of the Water Pump Defect. However, none of these revisions addressed the root cause of the Water Pump Defect or fixed the Defect.

117.   While Ford knew about the Water Pump Defect, Ford never replaced the defective water pumps in vehicles that had already been sold to Class members, denied warranty coverage when those water pumps failed and when engines were destroyed as a result of the Defect, and to this day continues to conceal the Water Pump Defect from the public.

### 6.   Ford's Knowledge of the Water Pump Defect is also Reflected in Ford's Visual Inspection Charts

118.   Ford's pre-sale knowledge that the water pumps in Class Vehicles are prone to failure before the useful life of the engine is also shown through Ford's Visual Inspection Charts used by mechanics and dealerships.

119.   Ford has historically recommended that mechanics *visually* inspect the coolant/water pump as part of routine maintenance procedures. For example, for vehicles with external water pumps, such as the 2008-2011 3.0L Ford Escape (which uses the predecessor engine to the Cyclone Engine), Ford's Visual Inspection Chart instructs mechanics to visually inspect for the following: (1) Leaks or weeps at: coolant pump; and (2) Cracked or damaged: coolant pump.

120.   These two necessary inspection tasks are, however, cost-prohibitive for vehicles containing the Ford Cyclone Engine with an internal water pump (e.g., a FWD/AWD Ford Edge) owing to the water pump's inaccessible placement in the engine.

121. Despite being cost prohibitive, as reflected below, these identical and necessary inspection tasks were listed in the Visual Inspection Chart for the early model years of the Class Vehicles, such as the 2007 Lincoln MKZ, 2008 Ford Taurus, 2008 Mercury Sable, and 2008 Ford Edge.

## 2007 Lincoln MKZ

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Leaks or weeps at:<br>— Hoses<br>— Tubes<br>— Clamp joints<br>— Quick connect couplings (if equipped)<br>— Gaskets<br>— O-rings<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Coolant pump<br>— Heater core (wet floor or coolant odor in vehicle)<br>— Heater control valve<br>— Heated throttle body or heated throttle body adapter (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Oil cooler (if equipped)<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Heated positive crankcase ventilation (PCV) (if equipped)<br>— Fuel pressure regulator Clayton bowl (if equipped)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped) | • Inoperative or damaged:<br>— Electric cooling fan (if equipped)<br>— Electronically actuated fan clutch<br>— Electronically actuated fan clutch controller<br>— Wiring, connectors, relays or modules<br>— Engine coolant temperature (ECT) sensor (if equipped)<br>— Cylinder head temperature (CHT) sensor (if equipped)<br>— Intake air temperature (IAT) sensor (if equipped)<br>— Mass air flow (MAF) sensor<br>— Vehicle speed sensor (VSS) |

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Cracked or damaged:<br>— Hoses<br>— Tubes<br>— Hose clamps<br>— Heater control valve (if equipped)<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Cooling fan<br>— Fan clutch (if equipped)<br>— Coolant pump<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Oil cooler (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped)<br>• Restricted airflow through the A/C condenser/radiator<br>• Drive belt loose, worn or installed incorrectly<br>• Broken or weak drive belt tensioner<br>• Excessive white or light gray exhaust smoke (may have burnt coolant odor)<br>• Coolant in engine oil<br>• Engine oil in coolant<br>• Coolant in automatic transmission fluid (if equipped)<br>• Automatic transmission fluid (if equipped) in coolant | |

## 2008 Ford Taurus

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Leaks or weeps at:<br>  — Hoses<br>  — Tubes<br>  — Clamp joints<br>  — Quick connect couplings (if equipped)<br>  — Gaskets<br>  — O-rings<br>  — Thermostat housing<br>  — Radiator<br>  — Pressure relief cap<br>  — Coolant pump<br>  — Heater core (wet floor or coolant odor in vehicle)<br>  — Heater control valve<br>  — Heated throttle body (TB) or heated TB adapter (if equipped)<br>  — Coolant crossover manifold assembly (if equipped)<br>  — Oil cooler (if equipped)<br>  — Degas bottle (if equipped)<br>  — Coolant expansion tank (if equipped)<br>  — Heated PCV (if equipped)<br>  — Fuel pressure regulator coolant bowl (if equipped, natural gas engine)<br>  — Cylinder block core plugs (if equipped)<br>  — Cylinder head core plugs (if equipped)<br>  — Block heater (if equipped) | • Inoperative or damaged:<br>  — Electric cooling fan (if equipped)<br>  — Electronically actuated fan clutch<br>  — Electronically actuated fan clutch controller<br>  — Wiring, connectors, relays or modules<br>  — Engine coolant temperature (ECT) sensor (if equipped)<br>  — Cylinder head temperature (CHT) sensor (if equipped)<br>  — Intake air temperature (IAT) sensor (if equipped)<br>  — Mass air flow (MAF) sensor<br>  — Vehicle speed sensor (VSS) |

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Cracked or damaged:<br>  — Hoses<br>  — Tubes<br>  — Hose clamps<br>  — Heater control valve (if equipped)<br>  — Thermostat housing<br>  — Radiator<br>  — Pressure relief cap<br>  — Cooling fan<br>  — Fan clutch (if equipped)<br>  — Coolant pump<br>  — Degas bottle (if equipped)<br>  — Coolant expansion tank (if equipped)<br>  — Oil cooler (if equipped)<br>  — Coolant crossover manifold assembly (if equipped)<br>  — Cylinder block core plugs (if equipped)<br>  — Cylinder head core plugs (if equipped)<br>  — Block heater (if equipped)<br>• Restricted airflow through the A/C condenser/radiator<br>• Drive belt loose, worn or installed incorrectly<br>• Broken or weak drive belt tensioner<br>• Excessive white or light gray exhaust smoke (may have burnt coolant odor)<br>• Coolant in engine oil<br>• Engine oil in coolant<br>• Coolant in automatic transmission fluid (if equipped)<br>• Automatic transmission fluid (if equipped) in coolant | |

## 2008 Mercury Sable

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Leaks or weeps at:<br>— Hoses<br>— Tubes<br>— Clamp joints<br>— Quick connect couplings (if equipped)<br>— Gaskets<br>— O-rings<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Coolant pump<br>— Heater core (wet floor or coolant odor in vehicle)<br>— Heater control valve<br>— Heated throttle body (TB) or heated TB adapter (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Oil cooler (if equipped)<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Heated PCV (if equipped)<br>— Fuel pressure regulator coolant bowl (if equipped, natural gas engine)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped) | • Inoperative or damaged:<br>— Electric cooling fan (if equipped)<br>— Electronically actuated fan clutch<br>— Electronically actuated fan clutch controller<br>— Wiring, connectors, relays or modules<br>— Engine coolant temperature (ECT) sensor (if equipped)<br>— Cylinder head temperature (CHT) sensor (if equipped)<br>— Intake air temperature (IAT) sensor (if equipped)<br>— Mass air flow (MAF) sensor<br>— Vehicle speed sensor (VSS) |

**Visual Inspection Chart**

| Mechanical | Electrical |
|---|---|
| • Cracked or damaged:<br>— Hoses<br>— Tubes<br>— Hose clamps<br>— Heater control valve (if equipped)<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Cooling fan<br>— Fan clutch (if equipped)<br>— Coolant pump<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Oil cooler (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped)<br>• Restricted airflow through the A/C condenser/radiator<br>• Drive belt loose, worn or installed incorrectly<br>• Broken or weak drive belt tensioner<br>• Excessive white or light gray exhaust smoke (may have burnt coolant odor)<br>• Coolant in engine oil<br>• Engine oil in coolant<br>• Coolant in automatic transmission fluid (if equipped)<br>• Automatic transmission fluid (if equipped) in coolant | |

## 2008 Ford Edge

### Visual Inspection Chart

| Mechanical | Electrical |
|---|---|
| • Leaks or weeps at:<br>— Hoses<br>— Tubes<br>— Clamp joints<br>— Quick connect couplings (if equipped)<br>— Gaskets<br>— O-rings<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Coolant pump<br>— Heater core (wet floor or coolant odor in vehicle)<br>— Heater control valve<br>— Heated throttle body (TB) or heated TB adapter (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Oil cooler (if equipped)<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Heated PCV (if equipped)<br>— Fuel pressure regulator coolant bowl (if equipped, natural gas engine)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped) | • Inoperative or damaged:<br>— Electric cooling fan (if equipped)<br>— Electronically actuated fan clutch<br>— Electronically actuated fan clutch controller<br>— Wiring, connectors, relays or modules<br>— Engine coolant temperature (ECT) sensor (if equipped)<br>— Cylinder head temperature (CHT) sensor (if equipped)<br>— Intake air temperature (IAT) sensor (if equipped)<br>— Mass air flow (MAF) sensor<br>— Vehicle speed sensor (VSS) |

### Visual Inspection Chart

| Mechanical | Electrical |
|---|---|
| • Cracked or damaged:<br>— Hoses<br>— Tubes<br>— Hose clamps<br>— Heater control valve (if equipped)<br>— Thermostat housing<br>— Radiator<br>— Pressure relief cap<br>— Cooling fan<br>— Fan clutch (if equipped)<br>— Coolant pump<br>— Degas bottle (if equipped)<br>— Coolant expansion tank (if equipped)<br>— Oil cooler (if equipped)<br>— Coolant crossover manifold assembly (if equipped)<br>— Cylinder block core plugs (if equipped)<br>— Cylinder head core plugs (if equipped)<br>— Block heater (if equipped)<br>• Restricted airflow through the A/C condenser/radiator<br>• Drive belt loose, worn or installed incorrectly<br>• Broken or weak drive belt tensioner<br>• Excessive white or light gray exhaust smoke (may have burnt coolant odor)<br>• Coolant in engine oil<br>• Engine oil in coolant<br>• Coolant in automatic transmission fluid (if equipped)<br>• Automatic transmission fluid (if equipped) in coolant | |

77

122.   In plain recognition that premature water pump failure could contaminate the engine oil, in these Visual Inspection Charts, Ford also included the visual inspection task of inspecting for "Coolant in engine oil" and advised: "If there is engine coolant in the engine oil or transmission fluid, the cause must be corrected and oil/fluid changed or major component damage can occur."

123.   In or around 2009, in an attempt to conceal the cost prohibitive – but needed – coolant pump specific inspection tasks, as reflected below, Ford amended its Visual Inspection Chart for the 2009 model year Class Vehicles by eliminating the task to visually inspect the coolant pump for cracks or damages. Ford also amended its Visual Inspect Chart for the 2009 model year Class Vehicles by eliminating the task of visually inspecting the water pump, and instead only requiring inspection for leaks and weeps at the water pump weep hole at the left hand side of the engine block, which is outside of the engine block and easily accessible.

| Visual Inspection Chart | |
|---|---|
| **Mechanical** | **Electrical** |
| • Leaks or weeps at:<br> ○ Hoses<br> ○ Tubes<br> ○ Clamp joints<br> ○ Gaskets<br> ○ O-rings<br> ○ Thermostat housing<br> ○ Radiator<br> ○ Pressure relief cap<br> ○ Coolant pump leaking from weep hole (LH side of engine)<br> ○ Heater core (wet floor or coolant odor in vehicle)<br> ○ Oil cooler (if equipped)<br> ○ Degas bottle<br> ○ Cylinder block core plugs<br> ○ Cylinder head core plugs<br> ○ Block heater (if equipped) | • Inoperative or damaged:<br> ○ Electric cooling fan<br> ○ Wiring, connectors, relays or modules<br> ○ Cylinder Head Temperature (CHT) sensor<br> ○ Vehicle Speed Sensor (VSS) sensor |

| Visual Inspection Chart | |
|---|---|
| **Mechanical** | **Electrical** |
| ● Cracked or damaged:<br>　○ Hoses<br>　○ Tubes<br>　○ Hose clamps<br>　○ Thermostat housing<br>　○ Radiator<br>　○ Pressure relief cap<br>　○ Cooling fan<br>　○ Degas bottle<br>　○ Oil cooler (if equipped)<br>　○ Cylinder block core plugs<br>　○ Cylinder head core plugs<br>　○ Block heater (if equipped)<br>● Restricted airflow through the A/C condenser/radiator<br>● Excessive white or light gray exhaust smoke (may have burnt coolant odor)<br>● Coolant in engine oil<br>● Engine oil in coolant | |

124.　The elimination of these inspection tasks, however, did not reflect an elimination of the problem and Ford continued to advise mechanics to visually inspect for "Coolant in engine oil."

125.　Notably, throughout this same period, for Ford vehicles which do not have internal water pumps, such as or the 2011-2017 3.7L RWD Ford Mustang (which uses a Cyclone Engine with an external water pump), Ford continued to instruct mechanics to visually inspect the water pump for leaks, weeps, cracks and damage.

126.　However, acknowledging the importance of inspecting the water pump as part of the inspection and verification of the cooling system, Ford began amending the Visual Inspection Charts for Class Vehicles to again include the cost-prohibitive task to inspect the coolant pump for cracks or damages.

127.   These amendments confirm that Ford has long known, but concealed the fact, that the inspection of the coolant pump is a necessary task. Nevertheless, this inspection task is cost prohibitive for vehicles with the Ford Cyclone Engine with an internal water pump owing to the water pump's inaccessible placement inside the engine block.

## V.   TOLLING OF THE STATUTE OF LIMITATIONS AND ESTOPPEL

128.   Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Water Pump Defect and the misrepresentations and/or omissions alleged herein. Through no fault or lack of diligence, Plaintiff and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Water Pump Defect or Defendant's deception with respect to the Defect.

129.   Plaintiff and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a Defect and/or that the Class Vehicles contained a Water Pump Defect and corresponding safety risk. As alleged herein, the existence of the Water Pump Defect was material to Plaintiff and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and members of the Class could not have discovered through the exercise of reasonable

diligence the existence of the Water Pump Defect or that Defendant was concealing the Defect.

130.   At all times, Defendant is and was under a continuous duty to disclose to Plaintiff and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Water Pump Defect and corresponding safety risk.

131.   Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiff and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

132.   For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## VI.   CLASS ACTION ALLEGATIONS

133.   Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All persons who purchased a Class Vehicle from an authorized dealer in New York for personal, family, or household purposes (the "New York Class" or "Class").

134.   Excluded from the Class are Defendant and its parents, subsidiaries, and corporate affiliates. Plaintiff reserves the right to revise the definition of the Class based upon subsequently discovered information and reserve the right to establish additional sub-classes where appropriate.

135.   The Class is so numerous that joinder of all members is impracticable. Plaintiff believes that there are at least thousands of proposed members of the Class throughout the United States.

136.   Common questions of law and fact exist as to all members of the Class and predominate over any issues solely affecting individual members of the Class. The common and predominating questions of law and fact include, but are not limited to:

- Whether the Class Vehicles contain the Water Pump Defect;

- Whether the Water Pump Defect is a design defect;

- Whether the Water Pump Defect in the Class Vehicles presents a safety risk;

- Whether and when Defendant knew or should have known about the Water Pump Defect;

- Whether Defendant knew or should have known that the Water Pump Defect in Class Vehicles presents a safety risk;

- Whether Defendant had a duty to disclose the Water Pump Defect and associated safety risk;

- Whether Defendant breached its duty to disclose the Water Pump Defect and associated safety risk;

- Whether Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts concerning the standard, quality, or grade of the Class Vehicles and/or the Water Pump Defect;

137.   Whether Defendant made material omissions concerning the standard, quality, or grade of the Class Vehicles and/or the Water Pump Defect;

- Whether members of the Class would pay less for a Class Vehicle if Defendant, at the time of purchase, disclosed the Water Pump Defect;

- Whether members of the Class would have purchased a Class Vehicle if Defendant, at the time of purchase, disclosed the Water Pump Defect;

- Whether Defendant actively concealed material facts from Plaintiff and members of the Class in order to, *inter alia*, sell more Class Vehicles and/or transfer repair or replacement costs to Plaintiff and members of the Class;

- Whether Defendant violated New York General Business Law §349;

- Whether Defendant violated New York General Business Law §350;

- Whether Defendant breached the implied warranty of merchantability;

- Whether Defendant committed fraud by omission or fraudulent concealment; and

- Whether actual, overpayment, statutory, compensatory, and/or punitive damages, restitution, compulsory, or other relief is warranted.

138.   Plaintiff's claims are typical of the claims of the Class Plaintiff seeks to represent. As alleged herein, Plaintiff and the Class sustained damages arising out of the same unlawful actions and conduct by Defendant.

139.   Plaintiff is willing and prepared to serve the Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or in conflict with the interests of the other members of the Class.

140.   Plaintiff's interests are co-extensive with and are not antagonistic to those of absent members within the Class. Plaintiff will undertake to represent and protect the interests of absent members within the Class and will vigorously prosecute this action.

141.   Plaintiff has engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, Plaintiff and absent members of the Class.

142.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

143.   Class action status is warranted under Rule 23(b)(3) because questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

144.   The interest of members within the Class individually controlling the prosecution of separate actions is theoretical and not practical. The Class has a high degree of similarity and is cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

145.   The nature of notice to the proposed Class is contemplated to be by direct mail upon certification of the Class or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII.   CLAIMS FOR RELIEF

### COUNT I
**Violation of New York General Business Law ("NYGBL") § 349**
**N.Y. Gen. Bus. Law § 349**
**(On behalf of Plaintiff and the New York Class)**

146.   Plaintiff incorporates by reference and re-alleges the allegations contained in paragraphs 1-145 of this Complaint.

147.   Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New York Class.

148.   Plaintiff and the New York Class members are "persons" within the meaning of New York General Business Law ("New York GBL"). N.Y. Gen. Bus. Law § 349(h).

149.   Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

150.   New York General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Ford's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Ford's deceptive acts and practices were intended to materially mislead consumers, including Plaintiff and the New York Class members, regarding the existence of the Water Pump Defect in the consumers' processes of purchasing Class Vehicles. Ford's deceptive acts and practices constitute "consumer-oriented" conduct directed at consumers. Further, Plaintiff and the New York Class members suffered injury as a result of the deceptive acts and practices.

151.   Ford's actions, as set forth above, occurred in the conduct of business, trade or commerce.

152.   Ford participated in unfair or deceptive trade practices that violated the New York GBL as described below and alleged throughout the Complaint. By failing to disclose the Water Pump Defect as associated safety risk, by concealing

the Water Pump Defect, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, reliability, and performance, and that stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and/or omitted material facts in connection with the sale of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, and/or omitted material facts relating to the Class Vehicles and Water Pump Defect in the course of its business.

153. Ford also engaged in unlawful trade practices by employing deception, deceptive acts, deceptive practices, fraud, misrepresentations, concealment, suppression, and/or omission of any material fact with the intent that others rely upon such concealment, suppression, and/or omission, in connection with the sale of the Class Vehicles.

154. Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

155. Ford knew that the Class Vehicles and their internal water pumps suffered from an inherent Defect, were defectively designed, and were not suitable for their intended use.

156. Ford knew or should have known that its conduct violated the New York GBL.

157.   Plaintiff and the Class members reasonably relied on Ford's misrepresentations and/or omissions of material facts in its advertisements of the Class Vehicles and in the purchase of the Class Vehicles as a reasonable consumer would.

158.   Had Plaintiff and the Class members known that the Class Vehicles contain the Water Pump Defect, they would not have purchased the Class Vehicles, or would have paid less for them. Plaintiff and Class members did not receive the benefit of their bargain as a result of Ford's misconduct and overpaid for the Class Vehicles with the undisclosed Defect.

159.   Ford owed Plaintiff and the New York Class members a duty to disclose the truth about the Water Pump Defect because Ford: (a) possessed superior and exclusive knowledge of the design of the Class Vehicles and the Water Pump Defect; (b) knew of the safety risk caused by the Defect; (c) intentionally concealed the Defect from Plaintiff and the Class members; and/or (d) made incomplete representations regarding the safety, quality and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the New York Class members that contradicted these representations.

160.   Due to Ford's superior and exclusive knowledge of the Defect, its knowledge of the safety risk caused by the Defect, and/or its false representations and/or omissions regarding the safety, quality, and reliability of the Class Vehicles,

Ford had a duty to disclose to Class members that the Water Pump Defect and associated safety risk. Having volunteered to provide information to Plaintiff and the Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they are likely to mislead a reasonable consumer and directly impact the value of the Class Vehicles purchased by Plaintiff and the Class members. Longevity, durability, performance, and safety are material concerns to Ford vehicle consumers. Ford represented to Plaintiff and the Class members that they were purchasing vehicles that were reliable, safe, of high quality, and containing engines and water pumps of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact the Class Vehicles contain the Defect and the likelihood that the internal water pumps fail due to the Water Pump Defect only increases over time. Plaintiff and the Class members relied on these material representations and/or omissions as a reasonable consumer would.

161.   Plaintiff and the Class members suffered injury in fact to a legally protected interest. As a result of Ford's conduct, Plaintiff and the Class members were harmed and suffered actual damages in the form of cost to repair, overpayment damages and/or the diminished value of their vehicles.

162.   As a result of Ford's conduct, Plaintiff and the Class members were harmed and suffered actual damages as a result of Ford's misrepresentations and/or

omissions with regard to their Class Vehicles' internal water pumps because they purchased vehicles at inflated prices and which do not perform as advertised.

163.   As a direct and proximate result of Ford's unfair or deceptive acts or practices, Plaintiff and the Class members suffered and will continue to suffer injury in fact and/or actual damages.

164.   Ford's violations present a continuing risk to Plaintiff and the Class members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Ford's deceptive practices are at least in the thousands; (2) Ford has significantly high sophistication and bargaining power with respect to the manufacture and sale of the Class Vehicles to Plaintiff and New York Class members; and (3) so long as the Class Vehicles continue to be sold and distributed and driven with the Defect, the likelihood of continued impact on other consumers is significant.

165.   Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and each Class member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiff and Class members also seek attorneys' fees, and any other just and proper relief available under the New York GBL.

## COUNT II
## Violation Of The New York General Business Law § 350
## N.Y. Gen. Bus. Law § 350
## (On behalf of Plaintiff and the New York Class)

166.   Plaintiff incorporates by reference and re-alleges the allegations contained in paragraphs 1-165 of this Complaint.

167.   Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New York Class.

168.   New York General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect[,]" taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity . . . ." N.Y. Gen. Bus. Law § 350-a.

169.   Ford caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff and the Class members.

170.   Ford violated the NY FAA because of the misrepresentations and/or omissions alleged herein, including, but not limited to, Ford's failure to disclose the

Water Pump Defect, by concealing the Water Pump Defect, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, reliability, and performance, and stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and/or omitted material facts in connection with the sale of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, and/or omitted material facts relating to the Class Vehicles and Water Pump Defect in the course of its business.

171.   In purchasing the Class Vehicles, Plaintiff and the Class members were deceived by Ford's failure to disclose that the Class Vehicles contain a Water Pump Defect that may result in failure of the Class Vehicles' internal water pumps, causing thousands of dollars in repair costs and can cause the Class Vehicles' engines to catastrophically fail and  become inoperable while driving.

172.   Plaintiff and the New York Class members had no way of knowing that Ford's representations and omissions were false and misleading, that the Water Pump Defect existed in the Class Vehicles, that the Defect can lead to costly water pump or engine replacement, that the normal and intended use of the Class Vehicles can cause the water pumps to fail, and/or that Ford would refuse to repair, replace, or compensate Plaintiff and the New York Class members for the failure of the defective water pumps and the known consequences of that failure to the Class

Vehicles, including engine failure, and would instead transfer those costs to consumers.

173.   Ford's unfair or deceptive acts or practices, fraud, misrepresentations, suppression, and/or omission of material facts were likely to, and did, in fact, deceive reasonable consumers.

174.   Ford intentionally and knowingly misrepresented and/or omitted material facts regarding the Class Vehicles with the intent to mislead Plaintiff and the Class members.

175.   Ford knew or should have known that its conduct violated the NY FAA.

176.   Plaintiff and the New York Class members reasonably relied on Ford's misrepresentations and/or omissions of material facts in its advertisements of the Class Vehicles and in their purchase of the Class Vehicles.

177.   Had Plaintiff and the New York Class members known that the Class Vehicles contain the Water Pump Defect and may suffer water pump and/or engine failure, they would not have purchased the Class Vehicles, or would have paid less for them. Plaintiff and members of the New York Class did not receive the benefit of their bargain as a result of Ford's misconduct and overpaid for the Class Vehicles with the undisclosed Defect.

178.   Ford owed Plaintiff and the Class members a duty to disclose the truth about the Water Pump Defect because Ford: (a) possessed superior and exclusive

knowledge of the design of the Class Vehicles and the Water Pump Defect; (b) intentionally concealed the foregoing from Plaintiff and the Class members; and/or (c) made incomplete representations regarding the safety, quality, and durability of the Class Vehicles, while purposefully withholding material facts from Plaintiff and the Class members that contradicted these representations.

179.    Due to Ford's exclusive and superior knowledge of the existence of the Defect and that the water pumps in the Class Vehicles may fail due to the Water Pump Defect, its false representations and/or omissions regarding the safety, quality, reliability, and durability of the Class Vehicles, and reliance by Plaintiff and the Class members on these material representations and/or omissions, Ford had a duty to disclose the Water Pump Defect and that Class Vehicles do not have the advertised and expected safety, durability and reliability, that failure of the internal water pumps can cause catastrophic and immediate damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Plaintiff and the Class members, Ford had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they are likely to mislead a reasonable consumer and directly impact the value of the Class Vehicles purchased by Plaintiff and the Class members. Longevity, durability, performance, and safety are material concerns to Ford vehicle consumers. Ford represented to

Plaintiff and the Class members that they were purchasing vehicles that were durable, reliable, safe, of high quality, and containing engines and water pumps of advanced and superior characteristics and technology as alleged throughout this Complaint, when in fact the Class Vehicles contain the Defect and the likelihood that the internal water pumps fail due to the Water Pump Defect only increases over time.

180.   Plaintiff and the Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Ford's conduct in that they overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations, fraud, deceptive practices, and/or omissions.

181.   Plaintiff and the New York Class members are entitled to recover their actual damages or $500, whichever is greater. Because Ford acted willfully or knowingly, Plaintiff and the New York Class members are entitled to recover three times actual damages, up to $10,000.

## COUNT III
### Breach of Implied Warranty of Merchantability
### N.Y. U.C.C. Law § 2-314
### (On behalf of Plaintiff and the New York Class)

182.   Plaintiff incorporates by references and re-alleges the allegations contained in paragraphs 1-181 of this Complaint.

183.   Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New York Class.

184.   Ford is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law § 2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

185.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law § 2-105(1).

186.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. U.C.C. Law § 2-314.

187.   Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased. Ford directly sold and marketed vehicles equipped with the defective water pumps to customers through authorized dealers, including those from whom Plaintiff and the Class members bought their Class Vehicles, for the intended purpose of consumers purchasing the vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff and the New York Class members, with no modification to the defective water pumps.

188.   Ford provided Plaintiff and New York Class Members with an implied warranty that the Class Vehicles and their components and parts are merchantable

and fit for the ordinary purposes for which they were sold, which is to provide safe and reliable transportation.

189.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their water pumps that were designed, manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their water pumps would be fit for their intended use while the Class Vehicles were being operated.

190.   The Class Vehicles' warranties were both substantively and procedurally unconscionable.

191.   There was a significant inequality in bargaining power between Defendant, a corporation with global reach that runs a national enterprise and produces form warranties for its vehicles *en masse*, and Plaintiff and members of the New York Class, who are individual consumers. As a result of this uneven bargaining power, Plaintiff and members of the Class had no meaningful ability to create or negotiate the warranty terms for their Class Vehicles, including the durational limits of the express and implied warranties.

192.   Defendant set the durational warranty limitations while having superior and exclusive knowledge of the Water Pump Defect. Defendant set the warranty limitations with the knowledge that the Class Vehicles contained the Water Pump Defect, that the Water Pump Defect poses a serious safety risk, that the likelihood

of water pump failure increases over time and is likely to occur after the warranty durational limits, that water pump failure can cause sudden, catastrophic engine failure, and that repairs resulting from water pump failure can cost thousands of dollars. With this knowledge, Defendant set the durational warranty limitations at a point where Plaintiff and the Class members were likely to experience water pump failures outside of their warranty period, wrongfully transferring the cost of the associated repairs to Plaintiff and the Class members. Indeed, the water pump in Plaintiff Militello's Class Vehicle failed approximately 1,300 miles outside of the warranty period Ford had dictated.

193.   Contrary to the applicable implied warranties, the Class Vehicles and their water pumps at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and the Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design and/or manufacture of their water pumps and the existence of the Water Pump Defect at the time of sale and thereafter. The Water Pump Defect can cause water pump failure and resultant in immediate, catastrophic engine failure while driving, posing a serious safety risk. Ford knew of this defect and the safety risk at the time of sale of the Class Vehicles, but failed to disclose the Defect and associated safety risk to Plaintiff and members of the New York Class.

194.   As a result of Ford's breach of the applicable implied warranties of the Class Vehicles, Plaintiff and the New York Class members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Plaintiff and members of the New York Class did not receive the benefit of their bargain as a result of Ford's misconduct and overpaid for the Class Vehicles with the undisclosed Defect.

195.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of N.Y. U.C.C. Law § 2-314.

196.   Plaintiff and the New York Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

197.   Plaintiff and the New York Class members were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of written warranty would have been futile. Ford was also on notice of the Water Pump Defect from the complaints and service requests it received from Plaintiff and the New York Class members, from repairs and/or replacements of the water pumps, and through other internal sources.

198.   As a direct and proximate cause of Ford's breach, Plaintiff and the New York Class members suffered damages and continue to suffer damages, including

economic damages at the point of sale, overpayment damages, cost to repair, and/or diminution of value of their Class Vehicles.

199.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff and the New York Class members have been damaged in an amount to be proven at trial.

## COUNT IV
### Fraud by Omission or Fraudulent Concealment
### (On behalf of Plaintiff and the New York Class)

200.   Plaintiff incorporates by references and re-alleges the allegations contained in paragraphs 1-199 of this Complaint.

201.   Plaintiff brings this cause of action on his own behalf and on behalf of the members of the New York Class.

202.   Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts including the standard, quality, or grade of the Class Vehicles and the fact that the Class Vehicles contain a Water Pump Defect and corresponding safety risk, with the intent that Plaintiff and members of the New York Class rely on Defendant's omissions. As a direct result of Defendant's fraudulent conduct, Plaintiff and members of the Class have suffered actual damages. Plaintiff and members of the New York Class did not receive the benefit of their bargain as a result of Ford's misconduct and overpaid for the Class Vehicles with the undisclosed Defect.

203.    Defendant knew (at the time of sale and thereafter) that the Class Vehicles contained the Water Pump Defect, yet, Defendant concealed the Defect, and never intended to repair or remedy the Water Pump Defect during the warranty periods. To date, Defendant has not provided Plaintiff and members of the New York Class with a repair or remedy for the Water Pump Defect.

204.    Defendant owed a duty to disclose the Water Pump Defect and its corresponding safety risk to Plaintiff and members of the New York Class because Defendant possessed superior and exclusive knowledge regarding the Defect, because the Defect presented a safety risk, and/or because Ford made a partial disclosure regarding the safety and reliability of the Class Vehicles. Defendant also owed a duty to disclose the Water Pump Defect and its corresponding safety risk because the Motor Vehicle Safety Act, 49 U.S.C. § 30118(c), places a duty on manufacturers to report vehicle defects. Rather than disclose the Defect, Defendant intentionally and knowingly concealed, suppressed, and/or omitted material facts regarding the standard, quality, or grade of the Class Vehicles and the presence of the Water Pump Defect and corresponding safety risk, to sell additional Class Vehicles at inflated prices and avoid the cost of repair or replacement of the internal water pumps in the Class Vehicles.

205.    The Water Pump Defect is material to Plaintiff and members of the New York Class. Plaintiff and members of the New York Class had a reasonable

expectation that the Class Vehicles would not contain a known Defect, such as the Water Pump Defect, that leads to exorbitant repair costs and exposes them and other vehicle occupants to a safety risk. No reasonable consumer expects a vehicle to contain a concealed Defect in design, such as the Water Pump Defect, that can lead to thousands of dollars in repair or replacement costs, and can cause catastrophic engine failure with little to no warning or time to take preventative measures or safely remove the vehicle from the road.

206.   Plaintiff and members of the  New York Class would not have purchased the Class Vehicles but for Defendant's omissions and concealment of material facts regarding the nature and quality of the Class Vehicles and existence of the Water Pump Defect and corresponding safety risk, or would have paid less for the Class Vehicles.

207.   Defendant knew its concealment and suppression of material facts was false and misleading and knew the effect of concealing those material facts. Defendant knew its concealment and suppression of the Water Pump Defect would sell more Class Vehicles and would discourage Plaintiff and members of the New York Class from seeking replacement or repair of the Water Pump Defect during the applicable warranty periods. Further, Defendant intended to induce Plaintiff and members of the Class into purchasing the Class Vehicles at inflated prices and to

discourage them from seeking replacement or repair of the Water Pump Defect during the warranty period in order to decrease costs and increase profits.

208.   Defendant acted with malice, oppression, and fraud.

209.   Plaintiff and members of the New York Class reasonably relied upon Defendant's knowing concealment and omissions as a reasonable consumer would. As a direct and proximate result of Defendant's omissions and active concealment of material facts regarding the Water Pump Defect and associated safety risk, Plaintiff and members of the Class have suffered actual damages in an amount to be determined at trial.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated in the New York Class, respectfully requests that this Court enter judgment against Defendant and in favor of Plaintiff and the Class, and award the following relief:

- An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the New York Class, and Plaintiff's counsel as counsel for the Class;

- A declaration that Defendant is financially responsible for all Class notice and the administration of Class relief;

- An order awarding costs, restitution, disgorgement, punitive damages, statutory damages, treble damages, and exemplary damages under applicable law, and compensatory damages for economic loss,

overpayment damages, cost of repair, diminished value, and/or out-of-pocket costs in an amount to be determined at trial;

- An order awarding any applicable statutory and civil penalties;

- An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

- An award of costs, expenses, and attorneys' fees as permitted by law; and

- Such other or further relief as the Court may deem appropriate, just, and equitable.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Date: October 5, 2022                    */s/Samuel H. Rudman*
                                         Samuel H. Rudman
                                         Robert M. Rothman
                                         Francis P. Karam
                                         Philip T. Merenda
                                         **ROBBINS GELLER**
                                           **RUDMAN & DOWD LLP**
                                         58 South Service Road, Suite 200
                                         Melville, NY 11747
                                         Telephone: (631) 367-7100
                                         Fax: (631) 367-1173
                                         srudman@rgrdlaw.com
                                         rrothman@rgrdlaw.com
                                         fkaram@rgrdlaw.com
                                         pmerenda@rgrdlaw.com

                                         Mark J. Dearman
                                         **ROBBINS GELLER**
                                           **RUDMAN& DOWD LLP**
                                         120 East Palmetto Park Road, Suite 500

Boca Raton, FL 33432
Telephone: (561) 750-3000
Fax: (561) 750-3364
mdearman@rgrdlaw.com

Joseph H. Meltzer
Melissa L. Troutner
Tyler S. Graden
Jonathan F. Neumann
**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
tgraden@ktmc.com
jneumann@ktmc.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
Emily E. Hughes (P68724)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@miller.law
ssa@miller.law
dal@miller.law
eeh@miller.law
wk@miller.law

***Attorneys for Plaintiff***
***and the Proposed Class***

105

John C. Goodson
Matt Keil
**KEIL & GOODSON P.A.**
406 Walnut Street
Texarkana, Arkansas 71854
Tel: (870) 772-4113
Fax: (870) 773-2967
jgoodson@kglawfirm.com
mkeil@kglawfirm.com

Robert H. Edwards
**THE EDWARDS FIRM, P.L.L.C.**
711 West Third Street
Little Rock, AR 72201
Tel.: (501) 372-1329

***Additional Counsel for Plaintiff
and the Proposed Class***